[No. S042224. July 24, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
TOMAS VERANO CRUZ, Defendant and Appellant.

COUNSEL

Michael R. Snedeker and Lisa R. Short, under appointments by the Supreme Court, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Bruce Ortega, Ross C. Moody and Alice B. Lustre, Deputy Attorney General, for Plaintiff and Respondent.

---

OPINION

**BAXTER, J.**—Following a stipulated change of venue from Shasta County to Sonoma County, a jury convicted defendant Tomas Verano Cruz of the first degree murder of Shasta County Deputy Sheriff Kenneth Perrigo (Pen. Code, § 187),[1] and forcible escape (§ 4532, subd. (a)). Each offense was found to have been committed with personal firearm use (§ 12022.5). Three special circumstances were found true: murder for the purpose of perfecting or attempting to perfect escape from lawful custody (§ 190.2, subd. (a)(5)); intentional murder of a peace officer while engaged in the performance of his or her duties (*id.*, subd. (a)(7)); and lying in wait (*id.*, subd. (a)(15)). After a penalty trial, the jury returned a verdict of death. The trial court denied the automatic motion to modify the penalty verdict (§ 190.4, subd. (e)) and imposed the death sentence. This appeal is automatic. (§ 1239, subd. (b).) All of defendant's claims having been found to be without merit, we affirm the judgment in its entirety.

## I. FACTS

### A. *Guilt Phase*

Early in the morning hours of October 21, 1991, Shasta County Deputy Sheriff Kenneth Perrigo was fatally shot with his own handgun by defendant, Tomas Cruz, then 23 years old, as he was transporting defendant and codefendant Carlos Estrada, both of whom had been arrested for being drunk in public, from the sheriff's substation in Burney to the main county jail in Redding. Defendant, while handcuffed, managed to reach under the front seat of the patrol car in which he was being transported and retrieve the deputy's fanny pack, in which was stored a backup nine-millimeter service handgun. The People alleged, and the jury so found, that defendant then lay in wait until an opportune time to shoot the officer, for the purpose of making good

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

his escape from the patrol car along with codefendant Estrada, and that Deputy Perrigo was intentionally murdered while engaged in the performance of his duties as a peace officer.

### 1. *Prosecution Evidence*

The Shasta County Sheriff's Department maintains a small substation in Burney housing a small office, justice courtroom, and holding cell to serve the surrounding rural communities. Burney is 50 miles from the county seat in Redding, where the main jail facility is located. The substation holding cell was only used while a detainee's paperwork was being prepared. Detainees who would be kept in custody overnight were always transported to the main jail in Redding.

Deputy Perrigo was assigned to the Burney substation and was on duty working the 7:00 p.m. to 3:00 a.m. shift on the night of October 20. Deputy Kevin Pitts, whose shift started at 11:00 p.m., was also on duty, as was Deputy Buck Dikes, whose shift would end at 11:00 p.m. Sometime around midnight, Deputy Perrigo was dispatched to the nearby town of McArthur on a theft-related call. Deputy Pitts offered to provide backup, which Deputy Perrigo declined.

Charlene Fry had made the call to 911 shortly before midnight. She gave the following account of the events that night. Fry was at the home of her friend Sherry Wadsworth in McArthur when defendant and Estrada knocked on the front door. Estrada had been romantically involved with Wadsworth and had been asked to move out of her house sometime prior to the incident. Both men appeared to have been drinking and were slurring their words. Defendant was carrying an open beer in one hand and a partial 12-pack in the other. Estrada got into a verbal altercation with Wadsworth over possession of his Social Security card. Defendant "stuck his foot in the front door," became angry and cursed at Fry. Defendant and Estrada refused to leave the area until Wadsworth threatened to call the sheriff. Eventually the two turned their attention to a car belonging to Wadsworth's roommate, "Miguel," parked in front of the house. They attempted in vain to start the vehicle, after which defendant opened the hood and removed the battery from the vehicle. The two then walked away with the battery, prompting Fry to call the sheriff.

Deputy Perrigo arrived on the scene, spoke with Fry and Wadsworth, left to look for defendant and Estrada, and eventually returned with the two men in the back of his patrol unit. Fry testified defendant was angry and screaming obscenities, yelling, "I'm not going to jail. I'm going to kill you," while Estrada sat crying in the patrol car. Miguel, from whose car the battery had been taken, was awakened, and Fry, Wadsworth, and Miguel followed Deputy

Perrigo in Fry's car to the home of Edna Sanchez, where defendant and Estrada had been located by the deputy. Defendant's brother Joaquin Cruz lived with Sanchez, and defendant was living in a stationwagon parked in front of the Sanchez house.

Miguel looked under the hood of the station wagon and identified the battery as the one taken from his car. Deputy Perrigo removed it and placed it near his patrol unit, at which point defendant became even more upset. He began hitting the window of the patrol car with his handcuffs, "flipping the bird," and screaming, "I'm going to kill you, you son of a bitch," "I'm not going to jail." Defendant started kicking at the door of the patrol car, threatening, in both English and Spanish, to kill Fry, Wadsworth, Miguel, and Deputy Perrigo.

Deputy Perrigo retrieved a "rope restraint" from the patrol car's glove compartment. Deputy Pitts testified such a restraint is normally used when a suspect is physically abusive and refusing to cooperate with officers. When a suspect is handcuffed with his hands behind his back, the restraint is looped around the suspect's feet and connected to the handcuff chain to limit movement of the legs or prevent the suspect from kicking or banging his head against the inside of a patrol car.

Fry observed Deputy Perrigo remove defendant from the rear seat of the vehicle and place his knee in the struggling defendant's back to get him to lie prone on the ground, belly down, so that he could re-handcuff defendant behind his back and affix the restraint. While the officer was doing this, Fry heard defendant continuing to scream at him, calling him a "son of a bitch," and repeatedly threatening to kill him. After adding the restraint, Deputy Perrigo placed defendant back in the rear seat of the patrol unit. Fry testified Deputy Perrigo used very little force in restraining defendant and putting him back into the patrol car. She did not see any injuries on defendant, nor did defendant complain of any injuries. Fry did recall hearing Deputy Perrigo saying something to the effect of, "I wonder how it feels to be a 50 pound sack of dogfood," as defendant was yelling while being placed back into the patrol car.

Sherry Wadsworth's account of the events that transpired corroborated Fry's testimony. Both defendant and Estrada appeared drunk upon arriving at her front door. Estrada argued with her about the return of his Social Security card, while defendant became belligerent, asked her if she "wanted problems," and stuck his foot in her door to prevent her from closing it. The men only left after she threatened to call the sheriff, with defendant removing and walking off with the battery from her roommate Miguel's car.

Wadsworth testified that after Deputy Perrigo returned with the men, he asked her, Fry, and Miguel to follow him back to Edna Sanchez's house to identify the battery. They did so, and once in front of the Sanchez house, identified the battery as the one taken from Miguel's car parked in front of Wadsworth's house. Deputy Perrigo then asked Wadsworth to tell defendant and Estrada they were being detained for being "drunk in public," and that "they'd be released in the morning." Wadsworth told this to defendant and Estrada in Spanish, then repeated it in English to Deputy Perrigo. Estrada was crying, whereas defendant was angry, screaming "over and over" in a "pretty loud" voice, "I'm going to kill you, fucking cop." Wadsworth testified defendant began "pound[ing]" his handcuffed hands against the patrol car window, and refused to stop doing so when Deputy Perrigo asked him to "be good, to be quiet." She then observed the deputy remove defendant from the patrol car while he continued to scream, "I'm going to kill you"; re-handcuff him, this time with his hands behind his back; and use his knee to bring defendant to the ground when defendant refused to comply so that the rope restraint could be applied. Deputy Perrigo then placed defendant back in the rear seat of the patrol unit before driving off with the two men. Wadsworth saw no injuries on defendant, did not hear him complain of any injuries, and, contrary to Fry's recollection, did not hear the deputy make any remarks to defendant as he was being placed back into the patrol car.

Edna Sanchez also testified for the prosecution. Defendant's brother, Joaquin Cruz, was her boyfriend and lived with her at her home. Defendant slept in a station wagon parked in front of her house. Sanchez testified that defendant and Estrada were sitting outside her house drinking beer starting about 5:00 p.m. They did not seem drunk at the time, and eventually left. Later, around midnight, she heard the engine of the station wagon being raced loudly. Not wanting trouble with her neighbors, she went outside, saw Estrada in the driver's seat and defendant in the passenger seat, and "hollered" at them to "knock it off."[2] When the two continued to rev the engine again, Sanchez went back outside to tell them to stop. Estrada grabbed Sanchez's wrist when she tried to reach for the station wagon keys, while defendant was "smiling" and "kicking back" in the passenger seat. Sanchez testified that shortly thereafter, Joaquin went outside and yelled at the two to stop revving the engine. Sanchez did not thereafter hear Deputy Perrigo arrive with the other witnesses to identify the battery that had been taken from Miguel's car and placed in the station wagon.

The dispatcher's log reflected that at 12:57 a.m. Deputy Perrigo radioed in that he had two suspects in custody for "§ 647(f)" (§ 647, subd. (f); hereafter section 647(f)), which meant public intoxication. The dispatcher testified he

---

[2] At a pretrial hearing, Sanchez had testified that defendant was "pretty drunk" and slurring his words when she went out to tell him and Estrada to be quiet.

recalled receiving Deputy Perrigo's transmission, and that the deputy sounded out of breath. At 1:28 a.m. Deputy Perrigo radioed his dispatcher that he was returning to the substation with the arrestees. Shortly after 2:00 a.m., Deputy Pitts arrived back at the substation just as Deputy Perrigo was helping defendant get out of the rear driver's side door of his patrol car. Deputy Pitts walked over to assist Deputy Perrigo. He could see that defendant's hands were handcuffed in front of him, with a rope restraint hanging down from the handcuffs, and one palm "facing out" while the other was "facing in," which Deputy Pitts knew meant that defendant had "slipped his cuffs" by stretching his arms down behind him, bringing his knees to his chest, and drawing his legs up through his handcuffed arms.

Deputy Pitts assisted Deputy Perrigo in bringing defendant into the substation. Defendant stated, "What are you guys going to do now, shoot me?" Deputy Perrigo replied, "I'm not going to shoot you." Defendant began dancing, singing, laughing, and acting "cocky." He commented to Deputy Perrigo, "[A]ll it would take is one bullet in your head." Defendant saw a birthday cake in the room and asked for a piece. After being placed in the holding cell, he continued singing, asked for a piece of cake, and began tapping on the fingerprint table in the cell, making comments in Spanish and English as he got "louder and louder." At one point Deputy Perrigo entered the cell, placed his hands on defendant's shoulders and "backed him into a bench" and "sat him down." As soon as the deputy exited the cell, defendant got up and started singing, dancing, and pounding on the table again.

Defendant's mood soon changed. He told the deputies to "stay away from his woman" and "not mess with her" or he would kill them. Deputy Pitts testified defendant resumed banging on the table, "making so much racket that you could barely hear yourself think." Deputy Pitts estimated that defendant threatened to kill Deputy Perrigo between five to seven times. Defendant, who is a Mexican national, kept repeating that he hated America, that "Americans treated him like shit," and that he would "just as soon kill all Americans."

Deputy Pitts testified defendant was again handcuffed with his hands behind his back so he would "be quiet and quit pounding on the table." Defendant then stated he would "be good" if allowed to use the bathroom. Deputy Perrigo went back into the holding cell, removed defendant's handcuffs, escorted him to the bathroom, then returned him to the holding cell. After completing necessary paperwork, Deputy Perrigo again handcuffed defendant's hands behind his back and placed him and Estrada in the rear of his patrol car. Deputy Pitts offered to handle the transport so that Deputy Perrigo would not have to put in overtime. Deputy Perrigo declined the offer.

After Deputy Perrigo secured defendant and Estrada in the rear seat of his patrol car, he went back into the substation for approximately 15 minutes, leaving the two men alone in the vehicle. Deputy Perrigo arranged through his dispatcher to have a sheriff's unit from the main jail in Redding meet him halfway between Redding and Burney to take custody of the arrestees. Deputy Pitts testified Deputy Perrigo left the substation with defendant and Estrada just before 3:00 a.m. Deputy Perrigo's last radio transmission was that he was en route to rendezvous with the patrol unit from Redding. Immediately thereafter, Deputy Pitts heard the Redding dispatcher confirm that a Redding patrol unit was heading toward the substation to make the arrestee exchange at the halfway point.

Within minutes, the Burney dispatcher attempted to contact Deputy Perrigo to advise him the Redding unit was on its way. He got no response. After trying several more times, on several radio frequencies, to contact Deputy Perrigo, Deputy Pitts attempted to contact him on his hand-held radio. There were no responses.

Lorinda McCulley lived on Highway 299 on the outskirts of Burney. Shortly after 3:00 a.m. on the morning in question, she heard a car crashing near her home, followed by a series of loud noises and then a gunshot. She walked up onto the highway and saw a marked patrol unit with its lights flashing and the driver's side rear door open. She called the Burney substation to report that one of their officers had been in an accident. Diane Strickland, who also lived close to the scene, likewise heard a loud crash at approximately 3:00 a.m., then a gunshot from the direction of the noise. Deputy Pitts received McCulley's phone call on the substation's normal business line and raced to the scene, which was 1.9 miles from the substation, or a two-to-two-and-a-half-minute drive away.

Upon arriving, Deputy Pitts observed Deputy Perrigo's patrol car "sitting kind of crossways" on the highway, "look[ing] as if it had rolled over," with the light bar "hanging off and to the front" and a visible dent in the vehicle's roof. The driver's side rear door was open, and neither defendant nor Estrada was in the vehicle or vicinity. Deputy Perrigo was "sitting still in the driver's seat slumped over to the side with his head on the window and his shoulder against the door post." There was blood on his face and clothing and his neck appeared to be broken. Deputy Pitts then noticed a hole in the Plexiglas partition and a "hole in the back of [Deputy Perrigo's] head." Additional officers and medical personnel were summoned to the scene.

Evidence technicians who later processed the crime scene observed the hole in the Plexiglas security screen between the front seat and backseat of the patrol unit. Among other items found scattered on the front floorboard of

Deputy Perrigo's vehicle were a part of a metal toilet-paper-roll holder and the officer's empty fanny pack, in which he was known to have kept a backup nine-millimeter service handgun. Expended nine-millimeter shell casings were found under the front and rear seats of the patrol unit, and unexpended nine-millimeter bullets were also found both inside and outside of the vehicle. The shell casing found under the rear seat was later determined to have been fired from the gun used to kill Deputy Perrigo. All of the windows in the patrol car were intact except for the rear driver's side door window, which was "shattered out." There was a bullet hole in the driver's side rear door latch area; gunpowder residue on the inside of the door was consistent with the door latch having been shot at from inside the vehicle. Defendant's palm prints were found on the handle of the open door.

The design of the Plexiglas security screen left an 11-inch gap between the floor of the patrol car and the edge of the metal shield at the base of the screen. Testimony established that the officer's fanny pack with the nine-millimeter handgun stored in it could be pulled through this opening near the automatic transmission "hump." A toilet-paper-roll holder was soon discovered missing from the holding cell bathroom in the substation.

The medical examiner's testimony established that Deputy Perrigo died of multiple gunshot wounds. He was shot once in the back of the head and once in the neck, with both gunshots having been inflicted while he was still alive. The gunshot wound to the back of his head was consistent with his having been shot through the Plexiglas security barrier. Bruising on the officer's face indicated he was alive when the patrol unit's airbag deployed. The medical testimony further established the gathered evidence and findings were most consistent with Deputy Perrigo's having been shot in the back of the head, and then slumping forward; having the airbag deploy into his face, causing him to fall backwards and fracture his neck; and then being shot a second time through the neck. Gunshot residue found on the front seat of the patrol car further suggested the second shot to the deputy's neck was fired by someone "standing in the doorway opening" of the vehicle. Deputy Perrigo's on-duty sidearm revolver was secured in its holster, which was still snapped closed, when he was transported to the hospital from the crime scene.

After a massive manhunt lasting nearly a week, defendant and Estrada surrendered and were taken into custody at the rice mill where defendant and his brother were employed. Recovered from the hayloft in which the two men were hiding was the murder weapon, a hacksaw, and portions of broken handcuffs.

Bernardo Sanchez, an employee at the rice mill, testified defendant and Estrada walked into the packing building where he was working sometime

prior to their subsequent surrender to police at the mill. Defendant still had on his handcuffs, with his wrists cuffed in front of him, twisted wrist over wrist. Sanchez overheard another worker, Guadelupe Duran, ask Estrada if they still had the murder weapon. Estrada replied the gun was hidden in the alfalfa. Duran asked "which one of them had done that wicked thing," a reference to the murder of Deputy Perrigo. Estrada motioned with his head toward defendant, who made no response. Defendant then stated that nothing would have happened if the lady had not called the police on them. Defendant asked the workers for money to buy clothes so that he and Estrada could flee to Oregon.

Detective Richard Newsome interviewed defendant and Estrada after their surrender, at which time defendant gave statements in which he confessed to killing Deputy Perrigo. Defendant told the detective that after he was restrained with the rope restraint and being transported to the Burney substation, he was able to "get loose" and slip his handcuffs to the front while still in the patrol car. He claimed that once inside the substation, he asked to use the bathroom but the officers would not permit him to do so. After being returned to the patrol car for transport to Redding, his hands were handcuffed behind him. Defendant stated he began kicking the front seat of the vehicle and a fanny pack with a weapon fell out. He retrieved the handgun, "worked the action" and saw that it was loaded and functional, then hid the gun behind him near where the seatbelt attaches to the seat. According to defendant, the two considered shooting Deputy Perrigo in the parking lot of the substation and escaping, but decided not to because "there were other deputies present." They also discussed "kicking out the back window of the patrol car" to make their escape. Ultimately they decided to "wait until they were on the road where there were no houses and shoot Deputy Perrigo," then escape. Defendant claimed that once the three were a short distance outside of Burney, in an area where defendant thought there were no houses, Estrada gave him "hand signals" and told defendant to "shoot him." Defendant told Detective Newsome he put the gun up against the Plexiglas, aimed at the back of Deputy Perrigo's head, closed his eyes and pulled the trigger. When asked why he shot Deputy Perrigo, defendant stated, "so they could escape," although he claimed Estrada had told him to shoot the officer. Sometime thereafter, defendant claimed he shot Deputy Perrigo because he (the deputy) was "making fun" of defendant.

Defendant also described how the patrol car then "got in a wreck." Defendant kicked out the back window and got out of the vehicle. He claimed he put the gun down on the seat, and that Estrada picked it up and shot Deputy Perrigo a second time. The two men then "ran to the woods."

The prosecution also introduced evidence that defendant had been arrested for being drunk in public a little over three months prior to this incident. On

that occasion in July 1991, he began spitting and kicking at the doors of the patrol car in which he was being transported to the substation, "slipped his cuffs" from back to front, and threatened to kill arresting officer Dikes "when he got out of custody" by shooting the officer "in the back of the head." Defendant was charged with threatening an officer in addition to the public intoxication charge on that occasion.

### 2. *Defense Evidence*

No defense to speak of was presented at the guilt phase. Defendant's brother, Joaquin Cruz, lived with Edna Sanchez and was the supervisor at the rice mill where defendant had worked for several weeks, and from which location defendant and Estrada were taken back into custody after the murder of Deputy Perrigo. Cruz confirmed that defendant was living in the station wagon in front of Sanchez's house. On the night of the murder, defendant was supposed to go to work, but Cruz told him not to do so because he had been drinking and Cruz felt he might get hurt. Cruz testified that defendant, Estrada, and a third man who were drinking together appeared happy at the time. After the murder, when workers from the mill told Cruz that defendant and Estrada had showed up at the mill, Cruz notified the mill's owner, and arrangements were made to have the two surrender to police.

### B. *Penalty Phase*

### 1. *Prosecution Evidence*

The parties stipulated that defendant had been arrested on three prior occasions: On August 5, 1988, for being drunk in public (§ 647(f)); on September 3, 1989, again for being drunk in public; and on January 7, 1990, for drunk driving (Veh. Code, § 23152, subd. (a)).

The People presented testimony regarding defendant's fourth arrest, on July 7, 1991, once again for being drunk in public, during which incident defendant also told arresting Deputy Dikes that when he (defendant) got out of custody he would get a gun and shoot the deputy "in the back of the head." On this occasion defendant, who appeared drunk, began prowling around a mobilehome in McArthur at which two teenage girls were babysitting a nine-month-old infant. Defendant's questions frightened the girls, who retreated into the home. Defendant then pressed his face against the kitchen window, further scaring the girls who began crying. One girl called her father who was nearby; upon his arrival he saw defendant attempting to open a window to gain access to the home. He chased defendant half a block before subduing him, and was kicked by defendant before police arrived and made the arrest.

The People also presented victim impact evidence at the penalty phase. Deputy Perrigo left behind a wife and three children. The oldest, an adopted child, Katie, age 14, was particularly devastated by the loss of her father; the middle child was nine years old, and the youngest four years old. Deputy Perrigo's wife testified about the victim's good character as a devoted father and citizen. He was a scoutmaster, was involved with the young men's program at a local church, and had served during his law enforcement career as an evidence technician, a hostage negotiator, and a SWAT team member. Deputy Perrigo's father had been a California Highway Patrol officer for over 22 years. He testified about his son's career in law enforcement, and broke down on the witness stand when describing the devastating impact his son's death had on the fallen officer's mother.

Finally, it was stipulated that registered nurse Claire Busby reviewed the jail medical records from all four incidents in which defendant was taken into custody, and that she found no evidence that defendant had suffered any physical injuries during or as a result of any of the arrests.

## 2. Defense Evidence

The defense presented the testimony of Claire Kantlehner, who was employed as the dispatcher at the Burney substation on July 7, 1991, the date on which defendant was arrested and taken into custody for being drunk in public during the prowling incident. Ms. Kantlehner had been a licensed vocational nurse prior to her employment as a dispatcher. She testified that upon being brought into the substation, defendant was "obnoxious," struggling to break free of his restraints, spitting, blowing mucous out of his nose, kicking, and "just intoxicated." Defendant was handcuffed, with his feet secured with a rope restraint, and Deputy Dikes wrapped some Curlex gauze around defendant's mouth to prevent him from spitting. At one point Ms. Kantlehner noticed defendant "was getting a little dusky like someone holding their breath." She suggested the deputies remove the gauze because she felt there was a possibility defendant was not getting enough air, and they did so.

Carol Shaw was a bookkeeper for the Fall River Wild Rice company in 1991. She knew defendant's brother, Joaquin Cruz, who had worked for the company for about five years. Defendant came to the rice plant in the fall of 1991 and worked there for seven or eight weeks. Shaw testified she spent much time with defendant because he was Cruz's brother and so they wanted him to be comfortable. She felt defendant was more pleasant and congenial than most of the laborers, and knew of no problems with his work. Shaw never saw defendant drinking, and never felt concern about her safety around him, even after the murder of Deputy Perrigo, when she knew he would probably be heading toward the rice plant.

Defendant, age 23 at the time of this offense, had a wife, Alma Hernandez, who came from Mexico to testify in his behalf, and brought their son, Edgar, who was seven years old at the time. Hernandez gave birth to Edgar when she was 15 years of age. The family was from Antiguo Taumin, Mexico. Hernandez testified defendant stayed with her until Edgar was six months old, then left for the United States to work. Defendant sent her money every month. He returned twice to Mexico, and loved his son very much. Hernandez testified that when defendant returned in 1988, he took her to register for "something about income tax," that she did not know she had actually married defendant, and that he laughed when she realized he had fooled her. Hernandez also recalled that once she and defendant were robbed by a "truckload of policemen" after attending a dance in Guadalajara.

Defendant's mother also testified in his behalf. She recalled that when defendant was 14 years old, he was taken away in handcuffs by the Mexican police and held for several days. When he was returned home, his head was shaved and he had been badly beaten. Defendant's mother testified further that the people of Antiguo Taumin are generally afraid of their local police.

Defendant's sister, Laticia, age 17, also traveled from Mexico to testify in his behalf. She testified defendant got along very well with everyone in Mexico, that she loved him very much, and that she wrote to him and relied on him for advice. She believed defendant to be a good father and husband, who wrote to his mother, his wife, and to her.

Defendant's brother Joaquin Cruz testified in his behalf. He related that two of their siblings had died—one in infancy, the other when hit by a car at age eight. Defendant had been in the United States for three years prior to this incident, had lived in the Fall River-McArthur area for most of that time, and lived with his brother at the Sanchez residence for most of the year prior to the murder. Cruz testified that by 1991, defendant had obtained his working papers and was a legal resident. Cruz knew defendant was in jail during the summer of 1991, but did not think he drank much until the day of the murder.

Dr. Jose J. LaCalle, who testified he was a "cross-cultural psychologist" working with the Hispanic and "Anglo-Saxon" cultures with specialties in clinical and forensic psychology, testified in defendant's behalf. He visited with defendant for a total of 10 and one-half hours in preparation for his testimony, and also traveled to defendant's hometown in Mexico to interview family members. He administered several standard tests, finding no evidence that defendant suffered from any neurological infirmities. He found defendant to have an IQ score of 81 on the American test. Dr. LaCalle administered the Minnesota Multiphasic Personality Inventory (MMPI) test and found no

evidence of gross psychopathology. He administered the Sacks Sentence Completion test which reflected that defendant was very candid and spontaneous. He also noted no major personality disorders in defendant, but detected "avoidant personality traits" that indicated he "does not socialize well."

Dr. LaCalle further described defendant as passive-aggressive and "not a person [who] usually involves himself in acting aggression. He is more likely to engage in reactive aggression." Overall, Dr. LaCalle found defendant's personality traits to be self-defeating. He further opined that defendant suffered from "chronic alcohol dependency."

Trial counsel asked Dr. LaCalle to furnish his professional opinion on the following hypothetical scenario: "Assuming the hypothetical question of a twenty-three year-old man of Mexican origin, who has been brutalized by the police in Mexico at an early age, and who was intoxicated at the time of his arrest and handled roughly by the arresting officer and finds a gun and uses it. What is your professional opinion about why he reacted as he did in shooting the officer?" Dr. LaCalle opined that defendant made a "primal response," a reaction exhibiting anger and hostility, not to the arresting officer specifically, but to the circumstances of police brutality having been suffered over the years.

On cross-examination, Dr. LaCalle conceded that only "some" of his conclusions were reflected in the report he prepared for trial. He did not formulate an opinion as to whether defendant knew right from wrong when he killed Deputy Perrigo. Dr. LaCalle further acknowledged that the profile results of the MMPI test administered to defendant reflected he "has little respect for authority and believes that a person should get away with everything he can." Dr. LaCalle felt such was a valid conclusion and consistent with his observations regarding defendant's antisocial personality traits.

## II. DISCUSSION

### A. Pretrial/Jury Selection Issues

#### 1. Batson-Wheeler Error

During jury selection defendant claimed the prosecution twice exercised its peremptory challenges to improperly excuse Hispanic prospective jurors (Nos. 1226 and 1419) on the sole basis of group bias, in violation of the federal and state Constitutions. (See Batson v. Kentucky (1986) 476 U.S. 79, 84–89 [90 L.Ed.2d 69, 106 S.Ct. 1712] (Batson); People v. Wheeler (1978) 22 Cal.3d 258, 276–277 [148 Cal.Rptr. 890, 583 P.2d 748] (Wheeler).) Hearings

were conducted and the motions denied, and the claims are here renewed on appeal. We find no cognizable error.

■ "Both the state and federal Constitutions prohibit the use of peremptory challenges to remove prospective jurors based solely on group bias. (*Batson, supra*, 476 U.S. at p. 89; *Wheeler, supra*, 22 Cal.3d at pp. 276–277.) Recently, 'the United States Supreme Court reaffirmed that *Batson* states the procedure and standard to be employed by trial courts when challenges such as defendant's are made. "First, the defendant must make out a prima facie case by 'showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' [Citations.] Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. [Citations.] Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.' [Citation.]" ' (*People v. Cornwell* (2005) 37 Cal.4th 50, 66–67 [33 Cal.Rptr.3d 1, 117 P.3d 622], quoting *Johnson v. California* (2005) 545 U.S. 162, 168 [162 L.Ed.2d 129, 125 S.Ct. 2410], fn. omitted.)" (*People v. Guerra* (2006) 37 Cal.4th 1067, 1100 [40 Cal.Rptr.3d 118, 129 P.3d 321] (*Guerra*).)

"In determining whether the defendant ultimately has carried his burden of proving purposeful racial discrimination, 'the trial court "must make 'a sincere and reasoned attempt to evaluate the prosecutor's explanation in light of the circumstances of the case as then known, his knowledge of trial techniques, and his observations of the manner in which the prosecutor has examined members of the venire and has exercised challenges for cause or peremptorily . . . .' [Citation.]" ' (*People v. Reynoso* (2003) 31 Cal.4th 903, 919 [3 Cal.Rptr.3d 769, 74 P.3d 852].) . . . 'All that matters is that the prosecutor's reason for exercising the peremptory challenge is sincere and legitimate, legitimate in the sense of being nondiscriminatory.' (*Id.* at p. 924.) A reason that makes no sense is nonetheless 'sincere and legitimate' as long as it does not deny equal protection. (*Ibid.*)" (*Guerra, supra*, 37 Cal.4th at pp. 1100–1101.)

### a. *Prospective Juror No. 1226*

With regard to Prospective Juror No. 1226, the trial court reviewed her responses to voir dire questioning and determined defendant did not make out a prima facie showing that her peremptory excusal was improperly based on group bias.[3] We need not, however, consider the propriety of the trial court's

---

[3] The trial court made the following findings on the record: "With regard to juror 1226, her questioning [from her voir dire transcript] indicated . . . that her son had been in trouble previously with the criminal justice system. A feeling that she had that sometimes that system

ruling that no prima facie case had been made out with regard to Prospective Juror No. 1226, as the record reflects she was not of Hispanic origin in the first instance, but rather was White, and for that reason she was not a member of the cognizable group identified by defendant within the meaning of *Batson, supra*, 476 U.S. 79, or *Wheeler, supra*, 22 Cal.3d 258. Defense counsel acknowledged as much on the record, arguing that "[she] is obviously a Caucasian, but she was married to a Spanish Mexican-American." Counsel then made clear why he believed her peremptory excusal was nonetheless subject to a *Batson-Wheeler* challenge—"Hispanic surnamed [as] well constitutes a cognizable group under *Wheeler*."

Defense counsel's argument overlooked an important subtlety regarding this point of law. As we explained in *Gutierrez, supra*, 28 Cal.4th 1083, with regard to the peremptory excusal of a similarly situated prospective juror, "April P. is not of Hispanic origin; she apparently acquired her Hispanic surname through marriage. Defendant argued below that this 'counts,' and he reasserts that position here. He is wrong. True, in *People v. Trevino* (1985) 39 Cal.3d 667, . . . 684 [217 Cal.Rptr. 652, 704 P.2d 719] (disapproved on other grounds in [*People v.*] *Johnson* [(1989)] 47 Cal.3d [1194,] 1219–1221 [255 Cal.Rptr. 569, 767 P.2d 1047]) we held that 'Spanish surnamed' sufficiently describes the cognizable class Hispanic under *Wheeler*—but only where no one knows at the time of the challenge whether the Spanish-surnamed

is not fair and a sense that the police were from time to time opinionated about situations, were not willing to consider other possibilities and listen to explanations. Her feeling about the criminal justice system causes me to make a finding that a prima facie case as to her was not established and that the challenge of that particular juror was based on a personal bias rather than a group bias, and since no prima facie showing was made no justification for her excus[al] is required."

The trial court's observations are borne out by Prospective Juror No. 1226's voir dire transcript. When asked if the criminal justice system was "fair," she responded, "In some instances. There's times it's not." She then complained about how the police had treated her son, stating, "they have their opinion, and they don't want to hear what you have to say." These responses constituted ample, nondiscriminatory bases on which to peremptorily excuse her. (See *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1123 [124 Cal.Rptr.2d 373, 52 P.3d 572] (*Gutierrez*) [prospective juror's father's incarceration "a valid race-neutral reason to excuse him"]; *People v. Garceau* (1993) 6 Cal.4th 140, 172 [24 Cal.Rptr.2d 664, 862 P.2d 664] [prospective juror whose family members "had run afoul of the law" properly excused]; *People v. Cummings* (1993) 4 Cal.4th 1233, 1282 [18 Cal.Rptr.2d 796, 850 P.2d 1] [prospective juror whose brother was convicted of a crime properly excused].)

We note the record does not affirmatively reflect whether the trial court applied the proper standard—an evidentiary showing sufficient to permit the trial judge to draw an *inference* of discrimination (see *People v. Johnson* (2006) 38 Cal.4th 1096, 1098–1099 [45 Cal.Rptr.3d 1, 136 P.3d 804] (*Johnson*))—in determining that defendant did not make out a prima facie showing that the excusal of Prospective Juror No. 1226 was improperly based on discriminatory group bias. We are not, however, relying on the prosecutor's stated reasons for excusing Prospective Juror No. 1226 as a basis for rejecting defendant's challenge to her peremptory excusal. Instead, as explained below, we rely on the fact that the record reflects she was not a member of the relevant cognizable class (Hispanic) to begin with.

prospective juror is Hispanic. (*People v. Trevino, supra*, 39 Cal.3d at p. 686.) Here, April P. twice indicated on her juror questionnaire that she was White, and when the trial court asked her for the record whether she was Hispanic, she replied 'No.' Although the record reflects ample race-neutral reasons for the challenge to April P., we need not discuss them here, as her excusal was not based on race within the meaning of defendant's *Wheeler* challenge." (*Gutierrez, supra*, 28 Cal.4th at p. 1123.)

Although the record here is less than clear as to whether the trial court perceived that Prospective Juror No. 1226 was not herself of Hispanic origin when, several days after the motion was taken under submission, the court proceeded to reach, address and reject the merits of defendant's *Batson-Wheeler* claim with regard to her excusal, we find that circumstance dispositive of the claim on appeal.

### b. *Prospective Juror No. 1419*

Prospective Juror No. 1419 was Hispanic. The trial court found that defendant made out a prima facie case of improper excusal of this prospective juror, noting on the record, "I have reviewed the transcript, in fact, several times. There is not a basis apparent to me from the face of the transcript for the excuse of that juror as was the case with [prospective juror] 1226. [¶] I'll make the following findings. First, that that juror [1419] is a member of a cognizable class; and second, that there is a strong likelihood that that exclusion [was] based on group association rather than personal bias. At this point, the prosecution will have an opportunity of justifying the excuse."[4]

Although the trial court made a good faith determination that a prima facie case of improper excusal for group bias had been shown with regard to Prospective Juror No. 1419, the prosecutor thereafter furnished ample reasons explaining why the peremptory excusal of the prospective juror was not motivated by discriminatory intent.

Among the many reasons given by the prosecutor for the excusal of Prospective Juror No. 1419 was that he was "only 20 years old" and perhaps "one of the youngest, or the youngest" prospective jurors under consideration, and "may not be in the mainstream and that experienced in life"; that he had

---

[4] With regard to Prospective Juror No. 1419, it appears the trial court may have applied an overly stringent "strong likelihood" standard in determining that defendant made a prima facie showing of discriminatory intent with regard to the excusal of this juror. (See *Johnson, supra*, 38 Cal.4th at pp. 1098–1099.) It matters not, of course, since the court found a prima facie showing had been made, and thus defendant suffered no prejudice if the court indeed utilized a higher standard.

"long hair," "Fu Manchu type" facial hair, had come to court in a long, unbuttoned flannel shirt, thereafter arrived at the peremptory challenge hearing in a plain white T-shirt, and appeared to be one of the "most poorly dressed" individuals in the courtroom; that his stated goal in life, to open up a small "comic book store," arguably showed a lack of life experiences; that his repeated belief that the evidence would have to be "strong" for him to impose death, his stated feeling that "at times the death penalty was used too much," and the fact that he "indicated some hesitation" about imposing the death penalty for a "cop killer," all created concerns for the prosecution; that he failed to answer questions Nos. 95 and 96 on the written jury questionnaire pertaining to his feelings about criminal defense attorneys, prosecutors, and police; that in responding to question No. 99, which asked, "Do you feel that a police officer's testimony is more truthful/accurate than that of a civilian?," he wrote, "police officers are human, and they can lie too"; that he gave the impression he "had some sympathy toward those individuals who became intoxicated"; and that the prosecutor felt he did not establish a very good "rapport" with the young prospective juror.

Defendant nevertheless argues we should undertake a point-by-point comparative analysis of Prospective Juror No. 1419's responses to the jury questionnaire and voir dire inquiries with those of the prospective jurors who were ultimately seated on his jury. He argues, for the first time on appeal, that such a "comparative juror analysis" serves to impeach the credibility of the prosecutor's stated reasons for excusing this prospective juror and establishes the prosecutor's discriminatory intent behind the excusal of the juror.

■ Recently, in *People v. Lenix* (2008) 44 Cal.4th 602 [80 Cal.Rptr.3d 98, 187 P.3d 946] (*Lenix*), this court held that "evidence of comparative juror analysis must be considered in the trial court and even for the first time on appeal if relied upon by defendant and the record is adequate to permit the urged comparisons." (*Id.* at p. 622.) We reviewed two recent United States Supreme Court decisions in which the high court conducted comparative juror analysis for the first time on appeal—*Snyder v. Louisiana* (2008) 552 U.S. 472 [170 L.Ed.2d 175, 128 S.Ct. 1203] (*Snyder*) and *Miller-El v. Dretke* (2005) 545 U.S. 231 [162 L.Ed.2d 196, 125 S.Ct. 2317] (*Miller-El*)—concluding those decisions "stand for the unremarkable principle that reviewing courts must consider all evidence bearing on the trial court's factual finding regarding discriminatory intent." (*Lenix, supra,* 44 Cal.4th at p. 607.)

We went on to observe in *Lenix, supra,* 44 Cal.4th 602, that both *Snyder* and *Miller-El* "demonstrate that comparative juror analysis is but one form of circumstantial evidence that is relevant, but not necessarily dispositive, on the issue of intentional discrimination." (*Id.* at p. 622.) We explained that although a written transcript may reflect that two or more prospective jurors

gave the same answers to a question on voir dire, "it cannot convey the different ways in which those answers were given. Yet those differences may legitimately impact the prosecutor's decision to strike or retain the prospective juror. When a comparative juror analysis is undertaken for the first time on appeal, the prosecutor is never given the opportunity to explain the differences he perceived in jurors who seemingly gave similar answers." (*Lenix*, at p. 623.) Observing that "[v]oir dire is a process of risk assessment" (*id.* at p. 624), we further explained that "[t]wo panelists [i.e., prospective jurors] might give a similar answer on a given point. Yet the risk posed by one panelist might be offset by other answers, behavior, attitudes or experiences that make one juror, on balance, more or less desirable. These realities, and the complexity of human nature, make a formulaic comparison of isolated responses an exceptionally poor medium to overturn a trial court's factual finding." (*Ibid.*)

Both high court decisions in *Snyder* and *Miller-El* ultimately "reiterate[] that reviewing courts must accord significant deference to the factual findings on the question of discriminatory intent. (*Snyder, supra,* 552 U.S. at pp. ___–___ [128 S.Ct. at pp. 1207–1208]; *Miller-El, supra,* 545 U.S. at p. 240 . . . .)" (*Lenix, supra,* 44 Cal.4th at p. 626.)

Consistent with our holding in *Lenix, supra,* 44 Cal.4th 602, we have undertaken a comparative juror analysis of the jury questionnaire and voir dire responses of other prospective jurors identified by defendant[5] as supportive of his claim that Prospective Juror No. 1419 was excused with discriminatory intent. Viewing such comparative evidence in light of the totality of evidence relevant on the claim, we conclude it does not demonstrate purposeful discrimination.

Question No. 66 of the jury questionnaire asked, "What are your opinions and feelings about how the criminal justice system works?" Prospective Juror No. 1419 answered, "I think it has gotten better over the years [and] I would have to say I like it so far." The prosecutor argued Prospective Juror No. 1419 was "probably one of maybe two or three individuals out of the entire couple hundred we have seen for both juries that felt the criminal justice system was good or getting better." The prosecutor further suggested the juror's response was "not in the mainstream of thinking." He attributed this to the prospective juror's being "an individual who does not have a tremendous amount of experience and contact in society and with this criminal justice system," and added, "This is probably most attributable to the fact that he is only 20 years old. He's the youngest or one of the youngest

---

[5] "The reviewing court need not consider responses by stricken panelists or seated jurors other than those identified by the defendant in the claim of disparate treatment." (*Lenix, supra,* 44 Cal.4th at p. 624.)

members that we saw. And his goals in life as a career kind of indicates his youthfulness. . . . [H]e indicates that his goals in the future are to own a business of—my own business of comic book store, which again indicates somebody who may not be in the mainstream and that experienced in life. And that created a tremendous amount of concern in determining whether or not we should keep this individual."

Defendant counters that the record reflects that a number of seated jurors "essentially agreed with juror 1419's assessment of the criminal justice system." Seated Juror No. 1091 thought the system "works well but with some faults." Seated Juror No. 1107 felt that in most cases the system was "fair." In response to the questionnaire, seated Juror No. 1444 opined that the system "works." Seated Juror No. 1475 responded, "the basic premise is great." Seated Juror No. 1663 responded, "All in all I feel it works well." Seated Juror No. 2428 responded, "the best system I have seen yet." Seated Alternate Juror No. 2501 believed the system "works fairly well." And seated Alternate Juror No. 1619 felt "they're doing a good job." With regard to this inquiry of the prospective jurors, the record does indeed tend to reflect that Prospective Juror No. 1419's view that the criminal justice system "has gotten better over the years," if viewed in isolation, was not out of the "mainstream of thinking." But clearly the prosecutor was not viewing the juror's response in isolation; rather, he was viewing it while mindful of the prospective juror's very young age in relation to all the other prospective jurors on the panel. The critical determination here is not whether the prosecutor's reasoning was entirely accurate, but rather whether his given reasons were credible and sincere, as opposed to a sham intended to mask his true intent to discriminate by striking a Hispanic prospective juror from defendant's jury.

Question No. 95 asked for the prospective jurors' "opinion" of criminal defense lawyers and prosecutors; question No. 96 asked, "What are your views of the police in general?" Prospective Juror No. 1419 failed to respond to either question, which the prosecutor indicated as another of his concerns with the prospective juror. Defendant points out that two seated jurors indicated "no opinion" to question No. 95, another wrote "Don't no [sic]," and another responded "N/A." Of course the failure to respond to a question altogether is arguably of greater concern than a forthright response of "no opinion" or "Don't know."

Question No. 99 asked the prospective jurors, "Do you feel that a police officer's testimony is more truthful/accurate than that of a civilian?" Prospective Juror No. 1419 responded "sometimes," adding, "police officers are human they can lie to [sic]." The prosecutor argued that "the fact that [Prospective Juror No. 1419] pointed out that [police officers] can lie, too, did

create some concern given his failure to answer question 96" ("What are your views of the police in general?"). Defendant points out that eight of the seated jurors answered question No. 99 with either "no" or "not necessarily." But expressing the opinion that a police officer's testimony is not "more truthful/accurate than that of a civilian" is qualitatively different than the affirmative response, "they can lie too."

Question No. 121 asked that if the prospective juror had strong feelings concerning the death penalty, then "are those feelings so strong that they would interfere with your ability to be objective during the guilt phase of the trial?" Prospective Juror No. 1419 had answered a preceding question by indicating he did not believe he had "strong feelings concerning the death penalty." He left the answer to question No. 121 blank. But then, in response to question No. 122—"if you are strongly opposed to the death penalty, would you be more inclined to find the defendants not guilty?"—he answered "no." This too concerned the prosecutor, who explained, "the Court I believe had noted this at one point on the record, that the answer to 121 would not need to be given if you had strong feelings basically in favor of the death penalty, but you would need to answer question 122 if you had strong feelings against. He failed to answer 121 and did in fact answer 122, again suggesting some feelings about the death penalty [that] were not acceptable to the People." Defendant in turn points out that "[t]he record shows that seated juror 1390 did not answer either question 121 or 122," but this circumstance sheds little light on Prospective Juror No. 1419's different and ambiguous responses to the series of questions.

Our review of the record taken as a whole demonstrates that substantial evidence supports the trial court's finding that the prosecutor's peremptory excusal of Prospective Jurors Nos. 1226 and 1419 was not motivated by discriminatory intent. (*People v. Bonilla* (2007) 41 Cal.4th 313, 341–342 [60 Cal.Rptr.3d 209, 160 P.3d 84].) Defendant's reliance on comparative juror analysis does not undermine this conclusion. We find that defendant's *Batson-Wheeler* motion was properly rejected below.

### 2. *Death Qualification of Jurors*

Defendant contends he was denied his constitutional right to an impartial jury because prospective jurors who were "death prone," and should have been excused for cause, were erroneously permitted to remain on the jury, and because prospective jurors who were "life prone," and should have been permitted to remain on the jury, were erroneously excluded for cause. Both contentions are without merit.

A trial court may discharge a juror whose views on the death penalty "would 'prevent or substantially impair the performance of his duties as a

juror in accordance with his instructions and his oath.' " (*Wainwright v. Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 105 S.Ct. 844]; see *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1140 [36 Cal.Rptr.2d 235, 885 P.2d 1] (*Rodrigues*).) The high court has explained that if a juror gives ambiguous or conflicting answers to inquiries about his or her views on the death penalty, the trial court is in the best position to evaluate those responses, and its determination as to the juror's actual state of mind is binding on appeal. (*Wainwright v. Witt, supra,* 469 U.S. at pp. 428–429; see *People v. Phillips* (2000) 22 Cal.4th 226, 234 [92 Cal.Rptr.2d 58, 991 P.2d 145]; *Rodrigues, supra,* 8 Cal.4th at p. 1147.) Any ambiguities in the record are to be resolved in favor of the trial court's determinations, and the reviewing court determines only whether the trial court's findings are fairly supported by the record. (*People v. Crittenden* (1994) 9 Cal.4th 83, 122 [36 Cal.Rptr.2d 474, 885 P.2d 887]; *People v. Howard* (1988) 44 Cal.3d 375, 417–428 [243 Cal.Rptr. 842, 749 P.2d 279].)

### a. *"Death Prone" Prospective Jurors*

Defendant contends 11 prospective jurors were "death prone," should have been excused for cause, and were "wrongly retained in the jury pool." He acknowledges, however, that he removed seven of these 11 jurors with his own peremptory challenges, and therefore complains of only four of them (Prospective Jurors Nos. 1349, 1323, 1622, and 1626) who "remained on the panel" after he exercised his final peremptory challenge. However, although these four prospective jurors may have "remained on the panel" for some time, *none* of them actually wound up selected to serve on defendant's petit jury. Because these prospective jurors "did not sit on defendant's jury, '[d]efendant could not possibly have suffered prejudice as a result of the court's refusal to excuse them at his request.' " (*People v. Hillhouse* (2002) 27 Cal.4th 469, 487–488 [117 Cal.Rptr.2d 45, 40 P.3d 754], quoting *People v. Millwee* (1998) 18 Cal.4th 96, 146 [74 Cal.Rptr.2d 418, 954 P.2d 990]; see *People v. Weaver* (2001) 26 Cal.4th 876, 913 [111 Cal.Rptr.2d 2, 29 P.3d 103]; *Ross v. Oklahoma* (1988) 487 U.S. 81, 86 [101 L.Ed.2d 80, 108 S.Ct. 2273].) Accordingly, "we need not resolve the substance of defendant's argument because the record reflects no possibility of prejudice." (*People v. Cox* (1991) 53 Cal.3d 618, 648 [280 Cal.Rptr. 692, 809 P.2d 351].)

### b. *"Life Prone" Prospective Jurors*

Defendant contends Prospective Jurors Nos. 1393[6] and 1158 were wrongfully excused from jury service by the trial court after expressing anti-death-penalty sentiments. We do not agree.

---

[6] Prospective Juror No. 1393 is the prospective juror who was questioned and challenged for cause by the prosecution at the page in the record cited by defendant. Although defendant

■ A prospective juror can be properly excused for cause if he or she is unable to conscientiously consider all of the sentencing alternatives, including the death penalty where appropriate. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1114 [74 Cal.Rptr.2d 121, 954 P.2d 384]; *Rodrigues, supra,* 8 Cal.4th at p. 1146.) There is no requirement that the prospective juror's bias against the death penalty be proved with unmistakable clarity. (*Wainwright v. Witt, supra,* 469 U.S. at p. 424.) Rather, the trial judge need only determine that the prospective juror would be unable to faithfully and impartially apply the law in the case before him or her. (*Rodrigues, supra,* 8 Cal.4th at p. 1147; *People v. Hill* (1992) 3 Cal.4th 959, 1003 [13 Cal.Rptr.2d 475, 839 P.2d 984].)

Prospective Juror No. 1393 told the court he would have difficulty "coming up with the death penalty, especially for the death penalty." He expressed uncertainty as to whether he could make the decision between a life and a death sentence. When defense counsel asked him, "And are you telling us that if—if the aggravating factors, the factors that make this a more heinous crime, outweigh the—significantly outweigh any kind of mitigating factors that there's—in all circumstances you could not impose the death penalty or vote for the death penalty?" he replied, "Yeah. I think that's right." At that point the prosecutor challenged Prospective Juror No. 1393 for cause, and the court excused him.

Prospective Juror No. 1158 repeatedly stated she could not vote to impose the death penalty. She indicated she was "not comfortable making the judgment on someone's life." She said it would "bother" her to vote for death because she did not "feel that I have a place to judge on someone's life." When asked if she could vote for death if the jury determined the aggravating factors substantially outweighed the mitigating factors, she replied, "No." She was then excused for cause.

Manifestly, neither of these two prospective jurors was improperly excused for cause.

### B. *Guilt Phase Issues*

#### 1. *Refusal to Instruct on Voluntary Manslaughter*

Defendant contends the trial court erred in refusing his request for voluntary manslaughter instructions based on provocation/heat of passion, and further, that the court had a sua sponte duty to instruct on imperfect

---

refers to Prospective Juror No. 1476 in his argument, we presume that numerical reference to be in error, as that prospective juror was passed for cause by both the prosecution and the defense.

self-defense as another theory of voluntary manslaughter. We find no such instructional error on this factual record.

■ Manslaughter, a lesser included offense of murder, is an unlawful killing without malice. (§ 192; *People v. Ochoa* (1998) 19 Cal.4th 353, 422 [79 Cal.Rptr.2d 408, 966 P.2d 442].) Malice is presumptively absent when a defendant kills "upon a sudden quarrel or heat of passion" (§ 192, subd. (a)), provided that the provocation is sufficient to cause an ordinarily reasonable person to act rashly and without deliberation, and from passion rather than judgment. (*People v. Berry* (1976) 18 Cal.3d 509, 515 [134 Cal.Rptr. 415, 556 P.2d 777].) Similarly, when a defendant kills in the actual but unreasonable belief that he or she is in imminent danger of death or great bodily injury, the doctrine of "imperfect self-defense" applies to reduce the killing from murder to voluntary manslaughter. (*People v. Michaels* (2002) 28 Cal.4th 486, 529 [122 Cal.Rptr.2d 285, 49 P.3d 1032]; *In re Christian S.* (1994) 7 Cal.4th 768, 771, 773 [30 Cal.Rptr.2d 33, 872 P.2d 574].)

■ In a criminal case, a trial court must instruct on general principles of law relevant to the issues raised by the evidence, even absent a request for such instruction from the parties. (*People v. Breverman* (1998) 19 Cal.4th 142, 154 [77 Cal.Rptr.2d 870, 960 P.2d 1094].) The obligation extends to instruction on lesser included offenses when the evidence raises a question as to whether all the elements of the charged offense were present, but not when there is no evidence that the offense committed was less than that charged. (*Ibid.*)

■ As explained in *People v. Barton* (1995) 12 Cal.4th 186 [47 Cal.Rptr.2d 569, 906 P.2d 531], a trial court must instruct on provocation/heat of passion as a theory of manslaughter, if supported by substantial evidence, even when the defendant objects on the basis that the instructions would conflict with his theory of the defense. (*Id.* at pp. 194, 196, 201.) The same sua sponte instructional obligation applies to unreasonable/imperfect self-defense, for such is not an affirmative defense, but rather a description of one type or theory of voluntary manslaughter. (*Id.* at pp. 194, 201.) However, the "substantial" evidence required to trigger the duty to instruct on such lesser offenses is not merely "*any* evidence . . . no matter how weak" (*People v. Flannel* (1979) 25 Cal.3d 668, 684, fn. 12 [160 Cal.Rptr. 84, 603 P.2d 1]), but rather " 'evidence from which a jury composed of reasonable [persons] could . . . conclude[]' " that the lesser offense, but not the greater, was committed. (*Id.* at p. 684, quoting *People v. Carr* (1972) 8 Cal.3d 287, 294 [104 Cal.Rptr. 705, 502 P.2d 513]; see *Barton, supra,* 12 Cal.4th at p. 201, fn. 8; *People v. Breverman, supra,* 19 Cal.4th. at pp. 162–163.)

In discussing the viability of a voluntary manslaughter instruction, the trial court commented on the fact that several hours had passed between the time

defendant was arrested by Deputy Perrigo in front of the Sanchez house in McArthur shortly after midnight, and the time he murdered Deputy Perrigo at approximately 3:00 a.m. The testimony of various witnesses in this case belies defendant's claims that his nose was broken upon his arrest, or that he was otherwise physically injured in the course of the events that led up to his murder of Deputy Perrigo. Although, as he was being brought into the Burney substation, defendant commented, "What are you guys going to do now, shoot me?," he immediately thereafter began dancing, singing, laughing, and acting "cocky." Indeed, shortly after Deputy Perrigo responded to defendant, "I'm not going to shoot you," defendant turned his attention to the deputy and stated, prophetically, "[A]ll it would take is one bullet in your head."

Defendant urges us to infer that from the time of his arrest for public intoxication four months earlier, in July 1991 (in connection with the prowling incident, during which he tried to gain entry into a mobilehome occupied by minors, kicked the father who managed to subdue him, and threatened to kill arresting Deputy Dikes with a bullet "in the back of the head"), until his arrest in this case, the Shasta County sheriff's deputies had harassed, mishandled, and humiliated him to the point where he acted out of the heat of passion and unreasonable self-defense in shooting Deputy Perrigo on the morning of October 21, 1991. The law, however, does not support defendant's claim. There is no evidence that defendant was physically injured, much less in imminent danger of great bodily injury or death at the hands of Deputy Perrigo or the other deputies with whom he came into contact from the time of his arrest sometime around midnight until he murdered Deputy Perrigo three hours later. Indeed, the exact opposite was true.

Moreover, the jury found beyond a reasonable doubt that defendant intentionally murdered Deputy Perrigo for the purpose of perfecting his escape from the deputy's lawful custody, and further, that defendant was lying in wait for a period of up to 15 or more minutes before selecting the most opportune time to retrieve the weapon he had concealed and shoot the defenseless deputy from behind in the back of the head. These special circumstance findings themselves negate any possibility that defendant was prejudiced from the failure to instruct on provocation/heat of passion or unreasonable self-defense theories of manslaughter.

### 2. *Admission of Defendant's Confessions*

Defendant renews his claim that his several statements given to police immediately following his surrender at the rice plant where he had been hiding, in which he confessed to killing Deputy Perrigo, should not have been

introduced against him at trial because his waiver of his constitutional trial rights was not voluntary, knowing and intelligent. (*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602] (*Miranda*).) He further seeks to argue the statements he gave were themselves involuntary, a claim that was never raised or developed below, and hence is not preserved for appeal. (*People v. Maury* (2003) 30 Cal.4th 342, 387–388 [133 Cal.Rptr.2d 561, 68 P.3d 1] (*Maury*); *People v. Mayfield* (1993) 5 Cal.4th 142, 172 [19 Cal.Rptr.2d 836, 852 P.2d 331].)

On October 2, 1992, defendant made an in limine motion to exclude his statements on the basis that the prosecution could not prove that he made a voluntary, knowing, and intelligent waiver of his *Miranda* rights. The People opposed the motion, and on November 3, 1992, a hearing was conducted on the motion. Detective Richard Newsome, the lead detective who questioned defendant shortly after his surrender, testified at the hearing.

It was established at the hearing that defendant had surrendered to authorities on the morning of October 26, 1991, five days after he fatally shot Deputy Perrigo and escaped from custody. Within an hour after being taken back into custody, defendant was transported back to the Burney substation. He was placed in the sergeant's office, a small room with a desk and a telephone. He was neither handcuffed nor restrained. There were no firearms or weapons in the room. Sergeant Bradd McDannold was seated behind the desk; Detective Newsome and an interpreter, Ms. Rubenstein, sat next to defendant. A recorded interrogation of defendant commenced at 1:05 p.m.

Although appearing tired and scared at first, both defendant and Estrada were alert and responsive throughout their interviews. Detective Newsome, who asked most of the questions, made no threats or promises to defendant or to his family. Defendant and Estrada were given food and water during the interrogation session, which they accepted.

After the group was introduced to defendant, Detective Newsome read him his *Miranda* rights, which were translated for him by the interpreter. Neither defendant nor the interpreter made any complaints at any point during the interrogation to suggest there were any difficulties, problems, or misunderstandings with the translations from English to Spanish and back.

Detective Newsome explained to defendant, "You have a right to talk to a lawyer and have him present with you while you are being questioned." When defendant was asked if he understood his right, he responded, "mas o menos," which means "more or less." Before asking any further questions, Detective Newsome read defendant his *Miranda* rights a second time. Defendant indicated after each one that he understood.

The first interview lasted a little over two hours, until 3:15 p.m. Estrada was then questioned while defendant waited in the holding cell, and at 5:15 p.m., defendant was again questioned for another 15 minutes, without being given new *Miranda* warnings.

Defendant was then transported to Red Bluff, and the following day he was again questioned by Detective Newsome, this time in the Tehama County Sheriff's office, after the autopsy of Deputy Perrigo had been completed. The detective once again read defendant each of his *Miranda* rights, at the conclusion of which defendant affirmed through his interpreter that he understood them and wished to talk to the detective. This interrogation session lasted less than an hour. Defendant was then questioned together with codefendant Estrada for another period of one hour and 45 minutes. Defendant was thereafter returned to Shasta County for arraignment the following day.

On November 3, 1992, the trial court denied defendant's motion to suppress his statements on *Miranda* grounds, stating on the record that, "the totality of circumstances I believe support a proper advisement, and suggests clearly a waiver was voluntary, knowing and intelligent. Certainly by circumstances, and at the very least by inference if not outright."

■ In reviewing defendant's claim that his *Miranda* rights were violated, we must accept the trial court's resolution of disputed facts and inferences, as well as its evaluation of the credibility of witnesses where supported by substantial evidence. (*People v. Whitson* (1998) 17 Cal.4th 229, 248 [70 Cal.Rptr.2d 321, 949 P.2d 18] (*Whitson*); *People v. Wash* (1993) 6 Cal.4th 215, 235–236 [24 Cal.Rptr.2d 421, 861 P.2d 1107].) *Miranda* makes clear that in order for defendant's statements to be admissible against him, he must have knowingly and intelligently waived his rights to remain silent, and to the presence and assistance of counsel. (*Miranda, supra,* 384 U.S. at p. 475.)

It is further settled, however, that a suspect who desires to waive his *Miranda* rights and submit to interrogation by law enforcement authorities need not do so with any particular words or phrases. A valid waiver need not be of predetermined form, but instead must reflect that the suspect in fact knowingly and voluntarily waived the rights delineated in the *Miranda* decision. (See *North Carolina v. Butler* (1979) 441 U.S. 369, 373 [60 L.Ed.2d 286, 99 S.Ct. 1755].) We have recognized that a valid waiver of *Miranda* rights may be express or implied. (*Whitson, supra,* 17 Cal.4th at p. 246; see also *People v. Cortes* (1999) 71 Cal.App.4th 62, 69 [83 Cal.Rptr.2d 519].) A suspect's expressed willingness to answer questions after acknowledging an understanding of his or her *Miranda* rights has itself been held sufficient to constitute an implied waiver of such rights. (*People v. Medina* (1995) 11

Cal.4th 694, 752 [47 Cal.Rptr.2d 165, 906 P.2d 2]; *People v. Sully* (1991) 53 Cal.3d 1195, 1233 [283 Cal.Rptr. 144, 812 P.2d 163].) In contrast, an unambiguous request for counsel or a refusal to talk bars further questioning. (*Davis v. United States* (1994) 512 U.S. 452, 458–460 [129 L.Ed.2d 362, 114 S.Ct. 2350].)

Although there is a threshold presumption against finding a waiver of *Miranda* rights (*North Carolina v. Butler, supra*, 441 U.S. at p. 373), ultimately the question becomes whether the *Miranda* waiver was knowing and intelligent under the totality of the circumstances surrounding the interrogation. (See *Oregon v. Bradshaw* (1983) 462 U.S. 1039, 1044–1046 [77 L.Ed.2d 405, 103 S.Ct. 2830] (plur. opn. of Rehnquist, J.); *People v. Clark* (1993) 5 Cal.4th 950, 986 [22 Cal.Rptr.2d 689, 857 P.2d 1099].)

Turning to the facts before us, defendant suggests his response, "mas o menos," or "more or less," when asked if he understood his *Miranda* rights read to him before the initial interrogation session, was "an expression of confusion, not understanding." We cannot agree. Nor do we find that single response, in isolation, controlling on the question whether defendant made a knowing and voluntary waiver of his *Miranda* rights under the totality of the circumstances surrounding his interrogation. (*Oregon v. Bradshaw, supra*, 462 U.S. at pp. 1044–1046.)

After defendant replied "more or less," and before any questioning commenced, Detective Newsome purposefully repeated each *Miranda* admonishment a second time, describing them in less "formal" terms so as to ensure that defendant could "better . . . understand" the rights he was waiving. The detective specifically told defendant he had the right to remain silent, and that this meant "you don't have to talk to us if you don't want to," to which defendant replied, "Yes," when asked if he understood that right. The detective then told defendant, "when you're talking to us, uh, anything you say can be used in court in a trial," to which defendant replied, "Yes I understand it." Defendant was then told, "when you are talking to us you have a right to have a lawyer with you," and defendant stated, "Yes, I understand it," when asked if he understood that right. Finally, defendant was told that if he did not have enough money to hire an attorney, "We'll get you one before we ask you any questions," to which defendant replied, "Yes, yes I understand you," when asked if he understood that right. It was not until *after* this second, full recitation of *Miranda* rights, and affirmations of understanding by defendant with regard to the nature of each such right, that the questioning of defendant commenced.

In consideration of the totality of circumstances surrounding the interrogation, we find that defendant's responses to Detective Newsome's inquiries

reciting his *Miranda* rights reflect a knowing and intelligent understanding of those rights, and that defendant's willingness to answer questions after expressly affirming on the record his understanding of each of those rights constituted a valid implied waiver of them. (*People v. Medina, supra*, 11 Cal.4th at p. 752; *People v. Sully, supra*, 53 Cal.3d at p. 1233.) As was the case in *People v. Wash, supra*, 6 Cal.4th 215, "the record is devoid of any suggestion that the police resorted to physical or psychological pressure to elicit statements from defendant. To the contrary, defendant's willingness to speak with the officers is readily apparent from his responses. He was not worn down by improper interrogation tactics, lengthy questioning, or trickery or deceit." (*Whitson, supra*, 17 Cal.4th at pp. 248–249.)

Defendant further seeks to argue that the statements he gave were themselves involuntary. The motion challenging the statements below, however, was based solely on an asserted *Miranda* violation. As a consequence of the issue not having been raised below, "the parties had no incentive to fully litigate this theory . . . and the trial court had no opportunity to resolve material factual disputes and make necessary factual findings." (*People v. Ray* (1996) 13 Cal.4th 313, 339 [52 Cal.Rptr.2d 296, 914 P.2d 846].) Accordingly, the claim of involuntariness of defendant's statements and confession is not preserved for appeal. (*Maury, supra*, 30 Cal.4th at pp. 387–388; *People v. Mayfield, supra*, 5 Cal.4th at p. 172.)

Assuming for purposes of argument that the claim of involuntariness of the statements and confession is properly before us, we reject it. The test for determining whether a confession is voluntary is whether the questioned suspect's "will was overborne at the time he confessed." (*Lynumn v. Illinois* (1963) 372 U.S. 528, 534 [9 L.Ed.2d 922, 83 S.Ct. 917].) "A finding of coercive police activity is a prerequisite to a finding that a confession was involuntary under the federal and state Constitutions." (*Maury, supra*, 30 Cal.4th at p. 404.) No coercive police activity is shown on this record. Defendant was not handcuffed or restrained while in the interview room, no guns or weapons were present, he was offered food and drinks which he accepted, and his older brother, Joaquin Cruz, was permitted to see him. Defendant does not allege that any improper promises or threats were made, and we see no evidence of any other form of coercive police activity that would support a finding of involuntariness.

### 3. *Examination of Peace Officer Personnel Files*

Defendant next claims the trial court erred in denying him discovery of the confidential peace officer personnel files of Shasta County Deputies Buck Dikes and John Carelli. The declaration in support of the motion, which also sought discovery of Deputy Perrigo's confidential personnel files, alleged, on

information and belief, that complaints of "aggressive behavior, acts of violence and/or attempted violence, acts of excessive force and/or attempted excessive force" had been lodged against the officers.

A hearing was conducted on the motion. County counsel appeared and opposed it, arguing the moving papers and declarations in support of the motion were inadequate, and that Deputies Dikes and Carelli were not even present when defendant was arrested for this offense. She further represented to the court that she had reviewed the files of all three officers and that "there is nothing in these files that even pertain to anything that [defendant and codefendant Estrada] appear to be looking for."

The trial court denied discovery of the confidential personnel files of Deputies Dikes and Carelli, observing that "the moving papers do not establish a basis on which the records of either Dikes or Carelli would be appropriately discoverable under the circumstances of this case. There is no basis in the moving papers on which a conclusion can be reached that their past conduct would in any way have anything to do with matters or material that might in any way be helpful to the defense in the case."

The trial court agreed to conduct an in camera review of Deputy Perrigo's confidential personnel file, going back five years. (See *City of Los Angeles v. Superior Court* (2002) 29 Cal.4th 1, 12 [124 Cal.Rptr.2d 202, 52 P.3d 129] [five-year limitation on such discovery not violative of due process].) Following its review, the court announced that Deputy Perrigo's files likewise contained no evidence of any complaints.

" 'A motion for discovery of peace officer personnel records is "addressed solely to the sound discretion of the trial court." (*Pitchess* v. *Superior Court* [(1974)] 11 Cal.3d [531,] 535 [113 Cal.Rptr. 897, 522 P.2d 305].) A review of the lower court's ruling is subject to an abuse of discretion standard.' " (*City of San Jose v. Superior Court* (1998) 67 Cal.App.4th 1135, 1145 [79 Cal.Rptr.2d 624].)

■ We find no abuse of discretion on this record. " 'In criminal cases, the court retains wide discretion to protect against the disclosure of information which might unduly hamper the prosecution or violate some other legitimate governmental interest.' " (*Pitchess v. Superior Court, supra,* 11 Cal.3d at p. 538, quoting *Joe Z. v. Superior Court* (1970) 3 Cal.3d 797, 804 [91 Cal.Rptr. 594, 478 P.2d 26].) Nor could defendant demonstrate prejudice on a finding of error, as county counsel's representations at the hearing on the motion below, and the trial court's statements upon completion of its review of Deputy Perrigo's confidential personnel files, together make clear that no information of the nature being sought through the discovery motion was to

be found in any of the three officers' personnel files. (*People v. Memro* (1985) 38 Cal.3d 658, 684 [214 Cal.Rptr. 832, 700 P.2d 446] [prejudice required for relief on appeal].)

### 4. *Admission of Photograph of Victim*

■■ Defendant contends the trial court erred by admitting exhibit 62, a photograph depicting visible injuries to the face of Deputy Perrigo, including blood. The prosecutor offered the photograph to demonstrate that the deputy was still alive after he was shot in the back of the head and his patrol car crashed, and then shot a second time in the neck. The defense objected to the admission of the photograph as inflammatory and irrelevant. It was not irrelevant. A crime scene photograph is relevant and may be admitted where it corroborates or clarifies "the coroner's testimony regarding the cause of death and condition of the body." (*People v. Mendoza* (2000) 24 Cal.4th 130, 171 [99 Cal.Rptr.2d 485, 6 P.3d 150].) Here, the trial court questioned Dr. Joseph Tripoli, the Shasta County Medical Examiner, who conducted the autopsy of the victim, before ruling the photograph admissible. Dr. Tripoli indicated that the particular photograph in question best depicted the "bluing of a subcutaneous contusion," and would thereby support his conclusions and serve to demonstrate to the jury that Deputy Perrigo was still alive when shot a second time. Nor was the presentation of the photograph unduly inflammatory. The trial court took steps to address defendant's concerns in that regard, ordering that the photograph only be made available for viewing by the jury during the brief time that Dr. Tripoli was testifying and actually referring to it. Neither error nor prejudice has been shown.

### 5. *Admission of Threat to Kill Deputy Dikes*

■■ Defendant next asserts the trial court erred in admitting evidence of his prior threat to kill Deputy Dikes by shooting the deputy "in the back of the head." There was no error in the admission of such evidence. As defendant concedes, this court's decision in *People v. Rodriguez* (1986) 42 Cal.3d 730 [230 Cal.Rptr. 667, 726 P.2d 113], specifically holds that a defendant's prior threats to kill a police officer may be admitted on the issue of intent when that defendant subsequently does kill a police officer. (*Id.* at p. 757; see Evid. Code, § 1101.) The prior threat to kill a deputy by shooting him in the back of the head was "manifestly admissible to show defendant's state of mind" at the time he fatally shot Deputy Perrigo in the back of the head. (*Gutierrez, supra,* 28 Cal.4th at p. 1138.) Evidence of the prior express threat to use force or violence was also properly admissible at the penalty phase as an aggravating circumstance under section 190.3, factor (b).

### 6. *Admission of Testimony of Bernard Sanchez*

Defendant next contends the trial court erred in permitting witness Bernardo Sanchez to testify regarding an adoptive admission by defendant that supported the finding that he had shot Deputy Perrigo.

Sanchez, an employee at the rice mill, testified defendant and Estrada walked into the packing building where he was working sometime prior to their surrender to police. Defendant still had on his handcuffs. Sanchez overheard another worker, Guadelupe Duran, ask Estrada if they still had the murder weapon. Estrada replied the gun was hidden in the alfalfa. Duran asked "which one of them had done that wicked thing," a reference to the murder of Deputy Perrigo. Estrada motioned with his head toward defendant, who made no response. Defendant then stated that nothing would have happened if the lady had not called the police on them. Defendant asked the workers for money to buy clothes so that he and Estrada could flee to Oregon.

 Defendant's claim that Sanchez's testimony was untrustworthy and violated his rights under the confrontation clause of the federal Constitution must be rejected. Evidence Code section 1221 provides, "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth." As was explained in *People v. Preston* (1973) 9 Cal.3d 308 [107 Cal.Rptr. 300, 508 P.2d 300], "[i]f a person is accused of having committed a crime, under circumstances which fairly afford him an opportunity to hear, understand, and to reply, and which do not lend themselves to an inference that he was relying on the right of silence guaranteed by the Fifth Amendment to the United States Constitution, and he fails to speak, or he makes an evasive or equivocal reply, both the accusatory statement and the fact of silence or equivocation may be offered as an implied or adoptive admission of guilt." (*Id.* at pp. 313–314.)

Defendant is wrong in suggesting the statement was admitted under the statement against penal interest exception to the hearsay rule—it was clearly proffered and admitted as an adoptive admission under Evidence Code section 1221. Moreover, it is well settled that an adoptive admission can be admitted into evidence without violating the Sixth Amendment right to confrontation "on the ground that 'once the defendant has expressly or impliedly adopted the statements of another, the statements become *his own admissions,* and are admissible on that basis as a well-recognized exception to the hearsay rule.' " (*People v. Turner* (1994) 8 Cal.4th 137, 190 [32 Cal.Rptr.2d 762, 878 P.2d 521], quoting *People v. Silva* (1988) 45 Cal.3d 604, 624 [247 Cal.Rptr. 573,

754 P.2d 1070].) Defendant's claim that Sanchez's testimony regarding the adoptive admission violated his rights under the confrontation clause is therefore unavailing.

We have further considered and must reject defendant's claim that he received "no notice at all" of Sanchez's proposed testimony. The record reflects that defendant did receive discovery detailing Sanchez's presence at the scene of the conversation in question and the inculpatory statements made at that time, and further reflects that Sanchez's name was on the prosecution's witness list. Indeed, defense investigators had sought to contact Sanchez to discuss his testimony. In any event, even were we to find that Sanchez's testimony regarding defendant's adoptive admission that he killed Deputy Perrigo was erroneously admitted, there could be no prejudice since defendant admitted as much in his own confession shortly after his surrender to authorities.

### C. *Special Circumstance Issues*

#### 1. *Murder of Peace Officer Special Circumstance*

Section 190.2, subdivision (a)(7), defines the special circumstance of intentional murder of a peace officer while engaged in the performance of his or her duties as follows: "The victim was a peace officer . . . who, while engaged in the performance of his or her duties, was intentionally killed, and the defendant knew, or reasonably should have known, that the victim was a peace officer engaged in the performance of his or her duties; or the victim was a peace officer . . . and was intentionally killed in retaliation for the performance of his or her official duties."

Deputy Perrigo was, of course, a peace officer, within the meaning of the special circumstance statute, working his shift at the Burney substation, and in full uniform in his patrol car when killed by defendant while transporting defendant and Estrada toward the main jail at Redding. Defendant cannot, and does not, contend that these essential elements of this special circumstance finding were not established on these facts.

However, it is also a "well-established rule that when a statute makes it a crime to commit any act against a peace officer engaged in the performance of his or her duties, part of the corpus delicti of the offense is that the officer was acting lawfully at the time the offense was committed." (*People v. Jenkins* (2000) 22 Cal.4th 900, 1020 [95 Cal.Rptr.2d 377, 997 P.2d 1044] (*Jenkins*), citing *In re Manuel G.* (1997) 16 Cal.4th 805, 815 [66 Cal.Rptr.2d 701, 941 P.2d 880]; see *People v. Gonzalez* (1990) 51 Cal.3d 1179, 1217 [275 Cal.Rptr. 729, 800 P.2d 1159] [applying the rule to § 190.2, subd. (a)(7)].)

Defendant contends that his arrest by Deputy Perrigo for a violation of section 647(f) (public intoxication) was unlawful because (1) he was not intoxicated at the time of his arrest, but was instead found asleep (along with Estrada) in the station wagon where he was staying in front of the Sanchez residence when first located by the deputy, and (2) the station wagon itself was on private property and not in a "public place." Claiming his arrest for a violation of section 647(f) was therefore unlawful, he argues the murder of a peace officer special circumstance must be reversed. We disagree.

Section 647(f) provides, in pertinent part, "Every person who commits any of the following acts is guilty of disorderly conduct, a misdemeanor: [¶] . . . [¶] (f) Who is found in any public place under the influence of intoxicating liquor . . . in a condition that he or she is unable to exercise care for his or her own safety or the safety of others, or by reason of his or her being under the influence of intoxicating liquor . . . interferes with or obstructs or prevents the free use of any street, sidewalk, or other public way."

■ Contrary to defendant's assertions, at the pretrial hearing held to determine the validity of his arrest, it was established, through both testimony and photographic evidence, that the station wagon in which Deputy Perrigo found defendant and Estrada sleeping sometime between midnight and 1:00 a.m. was parked in a public place, on the dirt shoulder adjoining Highway 299, and well outside the fence separating Edna Sanchez's property from the highway. "[W]hether a particular location is a 'public place' depends upon the facts of the individual case." (*People v. White* (1991) 227 Cal.App.3d 886, 892 [278 Cal.Rptr. 48].) A public place includes the area outside a home in which a stranger is able to walk without challenge. (*People v. Olson* (1971) 18 Cal.App.3d 592, 598 [96 Cal.Rptr. 132].)

Moreover, sitting in an automobile while intoxicated does not, as a matter of law, prevent one from being arrested for intoxication in a public place. (*People v. Belanger* (1966) 243 Cal.App.2d 654, 658 [52 Cal.Rptr. 660].) Nor does being found asleep in a vehicle prevent an arrest for public intoxication under section 647(f). (*People v. Belanger*, at p. 656; see *Mardis v. Superior Court* (1963) 218 Cal.App.2d 70, 72 [32 Cal.Rptr. 263] [arrest under § 647(f) valid where defendant found asleep in car 30 feet from paved roadway].)

At the pretrial hearing, Edna Sanchez testified that when she went outside of her residence about midnight to tell defendant and Estrada to stop making noise by racing the station wagon engine, defendant was "pretty drunk" and "slurred" his words. Defendant was arrested within an hour of Sanchez's observations. "An inebriated person behind the wheel of a car . . . poses a greater danger to himself or herself and others than the same person lying on a park bench." (*People v. Lively* (1992) 10 Cal.App.4th 1364, 1373 [13

Cal.Rptr.2d 368].) Moreover, although defendant would have us draw an inference that the station wagon in which he slept was not drivable, such fact was not conclusively established either at the pretrial hearing or at trial, and indeed the record facts instead support an inference that once a good battery was installed the vehicle's engine ran loud and strong.

We conclude the validity of defendant's arrest for public intoxication, a violation of section 647(f), was properly established at the pretrial hearing conducted for that purpose.

Alternatively, defendant contends that even if the legality of his arrest was properly established at the pretrial hearing, the evidence thereafter presented at trial was insufficient to support the jury's implicit finding that his arrest for a violation of section 647(f) was lawful, as an element of the murder of a peace officer special circumstance required to be proved beyond a reasonable doubt. Once again, we disagree.

Fry testified at trial that she observed defendant holding an open beer in one hand and a partial 12-pack of beer in his other hand just before midnight when he and Estrada appeared at the front door of Wadsworth's house. Both Fry and Wadsworth testified at trial that defendant was intoxicated; Wadsworth opining that defendant was "pretty drunk," Fry adding that both men were slurring their words. Defendant and Estrada left with the battery taken from Miguel's car and were located and detained by Deputy Perrigo less than an hour later in front of the Sanchez residence. Indeed, all of defendant's inebriated and belligerent conduct, from the time he and Estrada were brought to Wadsworth's house by Deputy Perrigo, to the time he was returned to the front of Sanchez's house along with Fry, Wadsworth, and Miguel to identify the battery that had been taken from Miguel's car, lends additional support to the jury's implicit finding that defendant was intoxicated a short time earlier, at around midnight, when he was located in the station wagon by Deputy Perrigo and placed under arrest.

We conclude that defendant's arrest for a violation of section 647(f) was lawful, and that the evidence is sufficient to support all the requisite elements of the murder of a peace officer special circumstance finding.

## 2. *Escape from Custody Special Circumstance*

Defendant contends the special circumstance of murder for the purpose of perfecting or attempting to perfect escape from lawful custody (§ 190.2, subd. (a)(5)) must be set aside because he was not in "lawful custody" when he killed Deputy Perrigo, and further, that the evidence was insufficient to establish that he "violated the law regarding escape" when he fatally shot the deputy. We find this claim, too, devoid of merit.

At the time of his arrest in 1991, section 4532, subdivision (a), provided that, "Every prisoner *arrested and booked for*, charged with, or convicted of a misdemeanor . . . who thereafter escapes or attempts to escape from [the] county or city jail, prison, industrial farm, or industrial road camp *or from the custody of the officer or person in charge of him*" is guilty of a felony. (Former § 4532, subd. (a), as amended by Stats. 1984, ch. 1432, § 7, p. 5025, italics added.) When a suspect flees from custody before being charged, convicted, *or booked* for the offense for which he was arrested, he is not subject to prosecution for violating section 4532. (*Wood v. Superior Court* (1975) 46 Cal.App.3d 564, 566 [120 Cal.Rptr. 214] (*Wood*).)

Initially, we note defendant made a pretrial motion to dismiss the escape charge and the special circumstance allegation of murder to perfect an escape on the ground that the evidence was insufficient to establish that his arrest was lawful. The motion was denied. After the prosecution rested its case-in-chief at the guilt phase, defendant moved pursuant to section 1118.1 for a directed verdict in his favor on both the escape charge (§ 4532) and the special circumstance allegation of murder to perfect escape from lawful custody (§ 190.2, subd. (a)(5)). He contended, citing *Wood, supra*, 46 Cal.App.3d 564, that the crime of escape required that he be *booked*, charged, or convicted before he could attempt to escape or escape, and that he was not "booked" for the offense for which he was arrested prior to being transported from the Burney substation to the main jail in Redding. The trial court treated this legal basis for the motion for a directed verdict as a uniform challenge to both the escape charge and the special circumstance allegation.

There is, however, an important distinction to be drawn here. In his argument before this court challenging the murder to perfect escape from lawful custody special-circumstance finding, defendant acknowledges he was "arrested, albeit unlawfully." We have, however, already concluded defendant's arrest for public intoxication pursuant to section 647(f) was *lawful*, in connection with our rejection of his challenge to the murder of a peace officer special circumstance. (*Ante*, at p. 673.) That legal basis having now been removed as a challenge to this murder to perfect escape from lawful custody special circumstance (§ 190.2, subd. (a)(5)), we believe this special circumstance finding is rendered legally valid, *regardless* whether defendant was thereafter validly "booked" for the public intoxication offense, a requirement going to the validity of the section 4532 conviction. Put differently, a formal charge and conviction of escape under section 4532 is not required to establish the murder to perfect an escape from lawful custody special circumstance, although one happens to be present in this case. Given the lawfulness of defendant's arrest, his escape from the lawful custody of Deputy Perrigo, for purposes of establishing the murder to perfect an escape special circumstance, cannot be found to turn on the validity of his conviction of the crime of escape pursuant to section 4532 alone, regardless whether he

was properly "booked" for that offense, as is required to establish the validity of that conviction. (*Wood, supra,* 46 Cal.App.3d at p. 566.) If that were the case, then had defendant killed Deputy Perrigo for the purpose of escaping from the deputy's custody after defendant's lawful arrest for a violation of section 647(f) *but before* they reached the Burney substation and defendant could be "booked" on the public intoxication charge, defendant would be immunized from prosecution for murder for the purpose of perfecting escape from lawful custody.

Turning to defendant's claim that the special circumstance of murder to perfect escape from lawful custody must be set aside because he was not properly "booked" on the public intoxication charge for which he was arrested *within the meaning of the escape statute* (§ 4532), we find the claim unavailing.

Defendant places principal reliance on Deputy Pitts's trial testimony that he (defendant) was not fingerprinted or "booked" upon arrival at the Burney substation because "that usually happened at Redding." Deputy Pitts's testimony, however, is not controlling on this point of law.

Rather, the term "to book" is defined in section 7, item 21, as "*the recordation of an arrest in official police records,* and the taking by the police of fingerprints and photographs of the person arrested, *or any of these acts* following an arrest." (Italics added.) Defendant's arrest clearly *was* recorded in official police records prior to his being transported from the Burney substation toward Redding; hence that fact itself establishes that he was technically "booked" on the section 647(f) charge within the meaning of section 7, item 21, and the escape statute (§ 4532).

Shasta County Sheriff's Sergeant Bradd McDannold testified, in connection with the section 1118.1 motion for a directed verdict on this special circumstance allegation, that a "probable cause declaration" is normally filled out and placed in the arrestee's "permanent jacket" for inclusion in the sheriff's records, and that Deputy Perrigo followed that procedure in defendant's case. Additionally, the Burney substation maintains an official "daily log" recording the activities of all of its officers, which is kept by the records supervisor and is an official record of the Shasta County Sheriff's Department. The daily log for the date and time of defendant's arrest recorded all pertinent information surrounding his arrest. We therefore find that the "probable cause declaration" and the "daily log" memorializing the details of defendant's arrest constituted "recordation of [his] arrest in official police records" within the meaning of the definition of "book[ed]" found in section 7, item 21.

Additionally, Sergeant McDannold testified that the reason defendant was not fingerprinted or photographed upon being brought into the substation on

the morning of October 21 was that his fingerprints and photograph were already on file with the department as a result of his earlier arrest in July of that same year by the same agency in connection with the prowling/public intoxication incident. In such instances, all that was required to complete the official booking process at the Burney substation and to authorize transport of defendant to the main jail in Redding was the completion of the "probable cause declaration." Sergeant McDannold testified further that public intoxication is not a "retainable" offense requiring fingerprinting in the first instance.

We conclude the record establishes that following defendant's valid arrest for a violation of section 647(f), and his transport to the Burney substation, defendant was "booked" on the charge within the statutory definition of that term, and hence the evidence is sufficient to support all the requisite elements of the murder to perfect the escape from lawful custody special circumstance finding.

### 3. *Lying-in-wait Special Circumstance*

#### a. *Constitutionality*

Defendant contends the special circumstance of lying in wait is unconstitutional because it fails to meaningfully narrow death eligibility. We have repeatedly rejected the same contention with respect to analogous facts and circumstances. (See, e.g., *Gutierrez, supra,* 28 Cal.4th at p. 1089; *People v. Crittenden, supra,* 9 Cal.4th 83, 155; *People v. Sims* (1993) 5 Cal.4th 405, 434 [20 Cal.Rptr.2d 537, 853 P.2d 992] (*Sims*); *People v. Roberts* (1992) 2 Cal.4th 271, 322–323 [6 Cal.Rptr.2d 276, 826 P.2d 274]; *People v. Wader* (1993) 5 Cal.4th 610, 669 [20 Cal.Rptr.2d 788, 854 P.2d 80]; *People v. Edwards* (1991) 54 Cal.3d 787, 824 [1 Cal.Rptr.2d 696, 819 P.2d 436]; *People v. Edelbacher* (1989) 47 Cal.3d 983, 1023 [254 Cal.Rptr. 586, 766 P.2d 1]; *People v. Morales* (1989) 48 Cal.3d 527, 557–558 [257 Cal.Rptr. 64, 770 P.2d 244] (*Morales*).)

 "The distinguishing factors identified in *Morales*[, *supra*, 48 Cal.3d 527] and *Sims*[, *supra*, 5 Cal.4th 405] that characterize the lying-in-wait special circumstance constitute 'clear and specific requirements that sufficiently distinguish from other murders a murder committed while the perpetrator is lying in wait, so as to justify the classification of that type of case as one warranting imposition of the death penalty.' (*People v. Sims, supra,* 5 Cal.4th at p. 434.)" (*Gutierrez, supra,* 28 Cal.4th at p. 1149.)

Defendant additionally contends the standard lying-in-wait special-circumstance instruction given below, CALJIC No. 8.81.15, "is impossible to understand and apply." This specific claim too has been repeatedly rejected. (*Sims, supra,* 5 Cal.4th at p. 434; *People v. Michaels, supra,* 28 Cal.4th at pp. 516–517.)

### b. *Sufficiency of Evidence of Lying in Wait*

Defendant contends there was "no evidence of any of the elements of lying-in-wait other than concealment of purpose, and 'mere concealment of purpose' is not enough to establish that a murder was committed while lying in wait." He urges, "Here, [defendant] did nothing to 'place himself in a position of advantage.' The crime was committed from the back seat of a police car in which he had been ordered to sit. It was sheer misfortune, and not planning, that led to his discovery of Deputy Perrigo's fanny pack, and the weapon inside, at a time when he was handcuffed in the back seat of a patrol car, when he [was] drunk, hurt, angry, confused, and frightened."

Defendant's argument belies the facts, even as related in his own confession to police, which we have found was free from constitutional infirmity and properly introduced into evidence below. (*Ante,* at pp. 665–669.)

"[T]he lying-in-wait special circumstance requires 'an intentional murder, committed under circumstances which include (1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage . . . .' (*People v. Morales, supra,* 48 Cal.3d at p. 557; *People v. Carpenter* (1997) 15 Cal.4th 312, 388 [63 Cal.Rptr.2d 1, 935 P.2d 708]; *People v. Sims, supra,* 5 Cal.4th at p. 432.) Furthermore, the lying-in-wait special circumstance requires 'that the killing take place *during the period of concealment and watchful waiting* . . . .' " (*Gutierrez, supra,* 28 Cal.4th at p. 1149.) All of those elements are established on this record.

In his statement to police, defendant related that after being returned to the patrol car for transport to Redding, and while his hands were handcuffed behind him, he began kicking the front seat of the vehicle and a fanny pack with a weapon fell out. He retrieved the handgun, "worked the action" and saw that it was loaded and functional, then hid the gun behind him near where the seatbelt attaches to the seat. According to defendant, he and Estrada considered shooting Deputy Perrigo in the parking lot of the substation and escaping, but decided not to because "there were other deputies present." Ultimately they decided to "wait until they were on the road where there were no houses and shoot Deputy Perrigo," then escape. Defendant claimed that once the three were a short distance outside of Burney, in an area where defendant thought there were no houses, Estrada gave him "hand signals" and told defendant to "shoot him." Defendant stated he put the gun up against the Plexiglas, aimed at the back of Deputy Perrigo's head, closed his eyes and pulled the trigger. When asked why he shot Deputy Perrigo, defendant initially candidly stated, "so that they could escape."

Together, the physical and circumstantial evidence, the testimony of Deputy Pitts, and defendant's own confession established that defendant obtained Deputy Perrigo's backup handgun by kicking the front seat until his fanny pack fell to the floor of the patrol car, then pulling the fanny pack through the opening between the floor of the vehicle and the bottom of the Plexiglas safety barrier and retrieving the gun from within, all while still handcuffed. Defendant then secreted the gun on the seat behind him, waited until Deputy Perrigo got back into the patrol unit, waited until they had driven two miles from the substation and were on a relatively secluded section of the highway with no houses in sight, then removed the weapon from its hidden location and intentionally shot Deputy Perrigo in the back of the head "by surprise with no opportunity [for the officer] to resist or defend himself" (*People v. Hillhouse, supra,* 27 Cal.4th at p. 501) for the admitted purpose of escaping, which purpose was accomplished.

Several decisions of this court have recognized that waiting for an opportune time to launch a surprise attack from the backseat of a vehicle against the driver or front seat passenger can constitute lying in wait. (See, e.g., *People v. Jurado* (2006) 38 Cal.4th 72, 119–120 [41 Cal.Rptr.3d 319, 131 P.3d 400]; *People v. Combs* (2004) 34 Cal.4th 821, 853 [22 Cal.Rptr.3d 61, 101 P.3d 1007]; *Morales, supra,* 48 Cal.3d at p. 554.) We conclude the evidence in this record is sufficient to support all of the requisite elements of the lying-in-wait special-circumstance finding.

### D. Penalty Phase Issues

#### 1. Challenges to Constitutionality of Death Penalty Statute

Defendant asserts various grounds in support of his claim that the California death penalty statute is unconstitutional. He acknowledges this court has previously rejected each of them, but raises them here in order to preserve the claims in federal court.

The claim that section 190.3, factor (a), which allows the jury to consider "[t]he circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true pursuant to Section 190.1," is unconstitutionally vague and overbroad has been rejected by the high court in *Tuilaepa v. California* (1994) 512 U.S. 967, 975–976 [129 L.Ed.2d 750, 114 S.Ct. 2630], and repeatedly rejected by this court. (See, e.g., *People v. Harris* (2005) 37 Cal.4th 310, 365 [33 Cal.Rptr.3d 509, 118 P.3d 545]; *People v. Stitely* (2005) 35 Cal.4th 514, 574 [26 Cal.Rptr.3d 1, 108 P.3d 182]; *Maury, supra,* 30 Cal.4th at p. 439; *People v. Lewis* (2001) 26 Cal.4th 334, 394 [110 Cal.Rptr.2d 272, 28 P.3d 34]; *Jenkins, supra,* 22 Cal.4th at pp. 1050–1053.)

Furthermore, "[t]he [death penalty] statute is not invalid for failing to require (1) written findings or unanimity as to aggravating factors, (2) proof of all aggravating factors beyond a reasonable doubt, (3) findings that aggravation outweighs mitigation beyond a reasonable doubt, or (4) findings that death is the appropriate penalty beyond a reasonable doubt." (*People v. Snow* (2003) 30 Cal.4th 43, 126 [132 Cal.Rptr.2d 271, 65 P.3d 749].) And except for prior violent crimes evidence and prior felony convictions under section 190.3, factors (b) and (c), the court need not instruct regarding a burden of proof, or instruct the jury that there is no burden of proof at the penalty phase. (*People v. Box* (2000) 23 Cal.4th 1153, 1216 [99 Cal.Rptr.2d 69, 5 P.3d 130]; *People v. Carpenter, supra,* 15 Cal.4th at pp. 417–418.)

Moreover, there is no requirement that California's death penalty sentencing scheme provide for intercase proportionality review. (*People v. Sapp* (2003) 31 Cal.4th 240, 317 [2 Cal.Rptr.3d 554, 73 P.3d 433].) And since capital defendants are not similarly situated to noncapital defendants, the death penalty law does not violate equal protection by denying capital defendants certain procedural rights given to noncapital defendants. (*People v. Johnson* (1992) 3 Cal.4th 1183, 1242–1243 [14 Cal.Rptr.2d 702, 842 P.2d 1]; *People v. Allen* (1986) 42 Cal.3d 1222, 1286–1287 [232 Cal.Rptr. 849, 729 P.2d 115].) Hence, the jury may consider unadjudicated offenses under section 190.3, factor (b) as aggravating factors without violating the defendant's rights to trial, confrontation, an impartial and unanimous jury, due process, or a reliable penalty determination. (*People v. Sapp, supra,* 31 Cal.4th at p. 316; *People v. Bolden* (2002) 29 Cal.4th 515, 566 [127 Cal.Rptr.2d 802, 58 P.3d 931].)

Nor does the use of adjectives such as "extreme" in section 190.3, factors (d) and (g), or "substantial" in section 190.3, factor (g), serve as an improper barrier to the consideration of mitigating evidence. (*People v. Visciotti* (1992) 2 Cal.4th 1, 73–75 [5 Cal.Rptr.2d 495, 825 P.2d 388] ["extreme" as used in § 190.3, factor (g)]; *People v. Adcox* (1988) 47 Cal.3d 207, 270 [253 Cal.Rptr. 55, 763 P.2d 906] ["substantial" as used in § 190.3, factor (g)].)

In a supplemental brief, defendant claims the penalty phase instructions unconstitutionally failed to identify which circumstances were aggravating and which were mitigating. The claim is unmeritorious, having been repeatedly rejected by this court. (See, e.g., *People v. Manriquez* (2005) 37 Cal.4th 547, 590 [36 Cal.Rptr.3d 340, 123 P.3d 614].) Indeed, defendant concedes the point and even quotes from a decision to that effect (*People v. Morrison* (2004) 34 Cal.4th 698, 730 [21 Cal.Rptr.3d 682, 101 P.3d 568]). He nonetheless urges us to part company with those decisions in his case because here, according to defendant, a portion of one juror's notes, made part of the augmented clerk's transcript on appeal, reflects that the juror did "aggravate[]

his sentence upon the basis of what were, as a matter of state law, mitigating factors, and did so believing that the State—as represented by the trial court [through the giving of CALJIC No. 8.85]—had identified them as potentially aggravating factors supporting a sentence of death." Fundamentally, however, the incomplete and inconclusive portions of a juror's notes on which defendant would have us rely cannot serve to impeach the jury's verdict. (Evid. Code, § 1150, subd. (a); *People v. Carter* (2003) 30 Cal.4th 1166, 1218 [135 Cal.Rptr.2d 553, 70 P.3d 981] [§ 1150, subd. (a) "renders inadmissible any evidence concerning the mental processes by which a verdict is determined."].)

Finally, defendant's claims that the high court's decisions in *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428], and *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348], apply to California's death penalty sentencing scheme have been rejected by this court. (*People v. Smith* (2003) 30 Cal.4th 581, 642 [134 Cal.Rptr.2d 1, 68 P.3d 302].) Nor is the statutory scheme so flawed that any imposition of the death penalty in this state would violate " 'international norms of humanity and decency.' " (*People v. Harris, supra,* 37 Cal.4th at p. 366; *People v. Ghent* (1987) 43 Cal.3d 739, 778–779 [239 Cal.Rptr. 82, 739 P.2d 1250].)

### 2. *Admission of Victim Impact Evidence*

■ Defendant contends the trial court erred by permitting the prosecution to present victim impact evidence at the penalty phase. There was no error in that regard. The introduction of victim impact evidence has been upheld in many cases. "Unless it invites a purely irrational response from the jury, the devastating effect of a capital crime on loved ones and the community is relevant and admissible as a circumstance of the crime under section 190.3, factor (a)." (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1056–1057 [47 Cal.Rptr.3d 467, 140 P.3d 775].) "The federal Constitution bars victim impact evidence only if it is 'so unduly prejudicial' as to render the trial 'fundamentally unfair.' " (*Id.* at p. 1056, quoting *Payne v. Tennessee* (1991) 501 U.S. 808, 825 [115 L.Ed.2d 720, 111 S.Ct. 2597].)

The victim impact evidence introduced in this case came well within permissible limits, and was typical of the victim impact evidence this court routinely permits. (See, e.g., *People v. Boyette* (2002) 29 Cal.4th 381, 444 [127 Cal.Rptr.2d 544, 58 P.3d 391] [family members speaking of their love of the victims, how they missed the victims in their lives, photographs of victims while still alive].)

Defendant also claims he did not receive adequate notice of the victim impact evidence that would be introduced at the penalty phase. The claim is

specious. The Perrigo family witnesses were placed on the prosecution witness lists, the defense was free to interview them, and trial counsel expressly acknowledged for the record that the defense received "very reasonable" notice of their planned testimony. Nor does the record substantiate defendant's claim that the testimony of Deputy Perrigo's widow constituted "essentially an unbroken narrative." Her testimony proceeded through questioning and answers, and trial counsel readily conceded he had opportunities to object but did not do so for obvious tactical reasons. Contrary to defendant's assertions, we find nothing improper in Ms. Perrigo's testimony, and nothing that would have served to unduly inflame the jury.

### 3. *Admission of Drunken Prowling Incident*

Defendant claims his penalty verdict was prejudiced by the admission of evidence of the July 7, 1991 incident that led to his arrest for public intoxication on that same date. On this occasion defendant, who appeared drunk, began prowling around a mobilehome in McArthur at which two teenage girls were babysitting a nine-month-old infant. Defendant's questions frightened the girls, who retreated into the home. Defendant then pressed his face against the kitchen window, further scaring the girls, who began crying. One girl called her father who was nearby; upon his arrival he saw defendant attempting to open a window to gain access to the home. He chased defendant half a block before subduing him, and was kicked by defendant before police arrived and made the arrest.

Defendant first contends Deputy Dikes should not have been permitted to testify that at the time of this incident, he (defendant) threatened the deputy by stating that when he got out of jail he would obtain a gun and shoot the deputy in the back of the head. As already noted (*ante,* at p. 671), Deputy Dikes's testimony constituted evidence of a prior *express* threat to use force or violence, and was therefore properly admitted at the penalty phase as a factor in aggravation under section 190.3, factor (b).

Defendant further contends there was nothing about the prowling incident itself that rendered testimony regarding it admissible in the People's case in aggravation at the penalty phase, and hence such testimony was erroneously admitted. We disagree.

"[W]hether a particular instance of criminal activity 'involved . . . the express or implied threat to use force or violence' (§ 190.3, factor (b)) can only be determined by looking to the facts of the particular case." (*People v. Mason* (1991) 52 Cal.3d 909, 955 [277 Cal.Rptr. 166, 802 P.2d 950] (*Mason*).)

The facts established were that defendant tried to enter a mobilehome, knowing it was occupied by two minor girls. He peered in the window, and

did not leave even when one of the girls "screamed" in fear. Instead, he tried to gain access into the residence by attempting to open a window. He fled only when confronted by the girl's returning father, who chased him one-half block before subduing him, and whom defendant was "fighting" with and kicked before police arrived and arrested defendant.

The prosecutor argued that defendant's conduct, separate and apart from his subsequent threat to shoot Deputy Dikes upon being arrested, contained an *implied* threat of violence, given that defendant knew he was attempting to enter an occupied residence in which the young occupants had seen him, become frightened, and started screaming. The trial court agreed in ruling the evidence admissible: "And I think that the *Mason* case basically discusses the—that a burglary per se, just a straight burglary which involves no requirement of the presence of any other human being, that that by itself would not be sufficient to raise this issue. And I don't dispute that at all. [¶] But because of the fact that not only the two girls, but more importantly the father who is an adult who presumably . . . [after being called home by the girls] was looking to confront the individual who was prowling or was around the house, the likelihood of there being that confrontation and the likelihood of that implied threat of violence to me is sufficiently established."

We agree with the trial court's ruling. The facts surrounding the July 1991 prowling incident support the finding of an implied threat of violence within the meaning of section 190.3, factor (b). (See *People v. Farnam* (2002) 28 Cal.4th 107, 176 [121 Cal.Rptr.2d 106, 47 P.3d 988].) The evidence was therefore properly admitted in the People's case in aggravation of penalty.

### 4. *Refusal to Admit Evidence of Police Brutality*

Defendant argues the trial court erred by excluding from his case in mitigation of penalty evidence he sought to develop through the testimony of his mother and his defense expert, Dr. Jose LaCalle, to the effect that, as a boy, he had been mistreated by local police in his hometown of Antiguo Taumin in Mexico, and that the "reputation" of the police among the people of that town was bad. We do not read the record as reflecting that the trial court imposed severe restrictions or limitations on such testimony, as defendant would have us conclude. Instead, we find the court was simply and properly sustaining prosecution objections to specific defects in the evidence offered by the defense.

With regard to the first complained-of evidentiary ruling, defendant's mother testified that when defendant was 14 years old he was taken away in handcuffs by the Mexican police and held for several days. When he was returned home, his head was shaved and he had been badly beaten. Although

she claimed defendant had been beaten *with a rifle and a bat*, she also revealed she had no personal knowledge of such facts. Accordingly, the court granted the prosecution's motion to strike the references in her testimony to defendant having been beaten *with a rifle and a bat*, and the jury was instructed to disregard them. The trial court did *not*, however, as defendant here argues, exclude all evidence in connection with the testimony about this incident through which he sought to show that he had been "brutalized" by the Mexican police. The court expressly *denied* the prosecutor's motion to the extent it sought to strike the witness's "testimony about [defendant's] being beaten by the Mexican police."

With regard to the second complained-of ruling, the trial court let stand defendant's mother's testimony that the "people" in defendant's hometown of Antiguo Taumin in Mexico are "generally" afraid of the police. However, when she was further asked on direct examination *why* the people of Antiguo Taumin are afraid of the police, the trial court sustained the prosecution's objection, explaining, "We [would] get into too many collateral matters with that subject." This ruling too was not in error, as the question sought to elicit an opinion from the witness on matters well beyond her personal knowledge.

Finally, defendant argues the trial court erroneously prevented him from questioning his expert witness, Dr. LaCalle, on the impact of police brutality on his upbringing as a youth in Antiguo Taumin. Here too, there was no such blanket restriction on the formulation of the defense.

The defense was *permitted* to ask Dr. LaCalle the following hypothetical question, without objection or restriction: "Assuming the hypothetical question of a twenty-three year-old man of Mexican origin, who has been brutalized by the police in Mexico at an early age, and who was intoxicated at the time of his arrest and handled roughly by the arresting officer and finds a gun and uses it. What is your professional opinion about why he reacted as he did in shooting the officer?" Dr. LaCalle gave his opinion that defendant made a "primal response," a reaction exhibiting anger and hostility, not to the arresting officer specifically, but to the circumstances of police brutality having been suffered over the years.

Defendant argues he should have been permitted to incorporate the details from his mother's testimony noted above—specifically, *that he had been beaten with a rifle and bat*—into the hypothetical question directed to his expert witness. But as already noted, there was no competent evidence introduced to establish those details. Defendant was, however, permitted to characterize his treatment as a youth at the hands of the Mexican police in Antiguo Taumin as that of having been "brutalized." Similarly, he was not permitted to include in the hypothetical question a reference that he grew up

"in an environment where the police are feared because of their frequent violent methods," again, because defendant's mother could not testify to such facts *from her personal knowledge,* and hence there was no foundational support for allowing the question to be so worded. This ruling was not in error. Nor did the trial court err in rejecting defendant's further argument that his mother's testimony about the feelings of the people of Antiguo Taumin toward the Mexican police, or the incorporation of that matter into the hypothetical question to Dr. LaCalle, should have been permitted under the reputation exception to the hearsay rule. (See Evid. Code, §§ 786, 1100, 1101.) The hearsay exception established in those Evidence Code sections fundamentally pertains to proof of the character of *a person* through external evidence, not the character of an entire police force.

### 5. *Refusal to Grant Penalty Phase Continuance*

Defendant contends he was prejudiced by the trial court's denial of his motion for a continuance during the penalty phase under somewhat unusual circumstances. His expert, Dr. LaCalle, was arrested during the trial on an unrelated matter—cruelty to animals arising from certain practices he utilized (electrocution) to kill chinchillas that he raised on his ranch for their pelts, an endeavor presumably unconnected to his occupation as a psychologist. Defendant argues that the arrest and publicity surrounding his expert witness's practice of killing chinchillas by electrocution diminished the effectiveness of his expert witness, and hence the requested continuance should have been granted to afford him an opportunity to obtain a new untainted expert.

When a newspaper article about Dr. LaCalle's troubles surfaced, defense counsel became concerned that it would destroy his credibility as an expert witness and prejudice the jury. Defense counsel therefore proposed three potential actions in response to the situation: (1) declare a mistrial, or give the defense a continuance to substitute a different psychologist, (2) grant a continuance until the effect of the article "dissipates," or (3) "bring the jurors in one at a time" and determine "how many people have read it," and if so, do they "say that it's prejudicial, [that] they can't be fair."

The trial court and parties opted for the third approach. All 12 jurors and two alternates were individually questioned about whether they had seen the article or any other press reports about the chinchilla affair, and whether they were aware of the name or identity of the person to whom the article referred. Eight of the 14 jurors had not seen the article or heard any media reports about the chinchilla story. Of the six who indicated some exposure to the story, only one, Juror No. 1633, reported that she had seen the article and had been exposed to radio and television reports about the incident. She indicated, however, that she had formed no opinion about the chinchilla rancher, and

stated, upon further questioning, that "[she] would take him as any other witness that's been on the stand, at face value and interpret what they have to say. I don't think what he does for—what [he] does for a living would apparently has caused this ruckus would—make me believe or disbelieve anything he said."

Following the initial voir dire of the jurors on the chinchilla story, the trial court made the following ruling: "Okay. All right. The Court concludes based on the responses from the jurors that first, there were very few even aware of it. [¶] And second, the one who really seemed to have acquired the most in the way of information who was Number 1663 seemed to me very frankly and honestly to say that it's a subject matter in—which would not concern her one way or the other. And that she would be quite capable of properly evaluating the evidence given by that person, same as anyone else. [¶] So the Court then makes the finding that there is not a basis on which either a mistrial should be declared, a new jury impaneled or other remedy taken concerning our chinchilla growing witness."

Each of the jurors was then admonished not to have any conversations about the chinchilla case, and not to read any newspaper articles, watch television stories, or listen to radio reports concerning that matter.

The day following the trial court's ruling, defense counsel renewed the defense request for a continuance based upon "escalating publicity or media coverage of Dr. LaCalle's current criminal problems." The court forthrightly acknowledged that "the publicity on this thing being a local issue is some-what profound, but if that publicity is not something that is affecting our jury, if they are simply not aware of it, or to the extent they're aware of it as one indicated yesterday that she or others can nevertheless proceed in an objective fashion, it's a—it's a problem that really isn't a problem."

Thereafter, each juror was once again brought into the courtroom and individually voir dired as to whether he or she had seen any additional news or media stories about the chinchilla affair since the day before. Each juror reported that he or she had not come in contact with any further media stories about the matter. The trial court then denied the renewed motion for a continuance.

■ The determination whether to grant a motion for a continuance rests within the sound discretion of the trial court. (*People v. Sakarias* (2000) 22 Cal.4th 596, 646 [94 Cal.Rptr.2d 17, 995 P.2d 152].) We find no abuse of such discretion here, as it was demonstrated that there was "no substantial likelihood" that any of the jurors "who became aware that publicity existed, were actually biased, that is, 'unable to put aside [their] impressions or

opinions based upon the extrajudicial information [they] received and render a verdict based solely upon the evidence received at trial.' " (*Jenkins, supra,* 22 Cal.4th at p. 1049, quoting *People v. Nesler* (1997) 16 Cal.4th 561, 583 [66 Cal.Rptr.2d 454, 941 P.2d 87].)

### 6. *Factor (a) and Racial Bias*

Defendant argues that because section 190.3, factor (a) permits the jury at the penalty phase to consider the "circumstances of the crime," but fails to provide "guidance" as to the scope of the factor, the jurors were impermissibly permitted to consider their own racial biases in deciding whether to return a death judgment against him. Specifically, defendant "does not maintain that the vagueness of factor (a) renders the jury's decision unconstitutional. Instead, [his] argument is that because factor (a) is open-ended, when a jury bases its decision on racial grounds, as was very likely the case here, the resulting sentence is unconstitutional." In support of his supposition that it was "very likely" the jury in his case "base[d] its decision on racial grounds," he points to the fact that Deputy Perrigo was White, whereas he is a member of a minority race (Hispanic).

Defendant proposed no instructions in the trial court along the lines he now suggests should have been given to combat what he perceives was a likelihood of racial prejudice in the proceedings below. Nor does he specify on appeal exactly what, in the way of further "guidance," should have been delivered to the jury through supplemental instructions directly concerning section 190.3, factor (a).

Section 190.3, factor (a), which allows the jury to consider "[t]he circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true pursuant to Section 190.1," has been found by the high court not to violate the Fifth, Sixth, Eighth, or Fourteenth Amendments to the United States Constitution by allowing arbitrary imposition of the death penalty. (*Tuilaepa v. California, supra,* 512 U.S. at pp. 975–976.) This court likewise has repeatedly found that factor (a) is neither impermissibly vague nor overbroad, and does not result in an arbitrary and capricious penalty determination. (*People v. Harris, supra,* 37 Cal.4th at p. 365; *People v. Stitely, supra,* 35 Cal.4th at p. 574; *Maury, supra,* 30 Cal.4th at p. 439; *People v. Lewis, supra,* 26 Cal.4th at p. 394; *Jenkins, supra,* 22 Cal.4th at pp. 1050–1053 [factor (a) provides adequate guidance to a jury in capital sentencing].)

We perceive no basis on which to reverse the judgment based on defendant's largely speculative claim that further guidance in the way of supplemental instructions should have been provided to the jury with specific regard to section 190.3, factor (a).

### 7. *Violations of International Law*

Contrary to defendant's contention, a sentence of death that complies with state and federal constitutional and statutory requirements has been held by this court not to violate international law. (*People v. Tafoya* (2007) 42 Cal.4th 147, 199 [64 Cal.Rptr.3d 163, 164 P.3d 590]; *People v. Hillhouse, supra,* 27 Cal.4th at p. 511.)

### 8. *Cumulative Prejudice*

Defendant observes that, "[t]his court has recognized that, at a capital penalty trial, lingering doubts about guilt constitute a proper factor in mitigation of the penalty. (*People v. Hawkins* (1995) 10 Cal.4th 920, 966–968 [42 Cal.Rptr.2d 636, 897 P.2d 574].)" He then urges that, "By definition, it takes less to raise a lingering doubt than it takes to raise a reasonable doubt. Guilt phase errors which might be found harmless under traditional guilt phase tests of prejudice might nonetheless have the effect of negating a lingering doubt as to intent, intoxication, etc. Such errors may prejudicially impact the penalty determination even though they may be harmless as to the guilt verdict. [¶] Accordingly, this Court must make a separate assessment of the impact of each guilt phase error, and of the cumulative impact of all guilt phase errors, on the penalty determination."

We have, however, found no appreciable error at the guilt or penalty phase of defendant's trial. Accordingly, we have no occasion here to make "a separate assessment of the impact of each guilt phase error," nor of "the cumulative impact of all guilt phase errors" on the penalty determination reached in this case.

Defendant argues further that, "Where the evidence, though sufficient to sustain the verdict, *is extremely close,* any substantial error tending to discredit the defense, or to corroborate the prosecution, must be considered as prejudicial." (Italics added.) Once again, we have found no appreciable error at the guilt or penalty phases of defendant's trial, much less "substantial error," nor do we share defendant's view that the evidence in this case within reason can be characterized as "extremely close."[7]

---

[7] In 2004, the International Court of Justice ruled that the United States had violated the Vienna Convention in numerous cases by failing to provide arrested foreign nationals access to consular officials. (*Case Concerning Avena and Other Mexican Nationals* (Mexico v. United States of America) 2004 I.C.J. 128 (Judg. of Mar. 31, 2004).) Defendant, a Mexican national, is one such individual named in that case. Defendant has raised a claim pertaining to the matter in a habeas corpus petition presently pending in this court. (*In re Cruz,* S129510.) The claim, involving matters outside this appellate record, is properly raised on habeas corpus and will be addressed and resolved in that proceeding.

### III. Conclusion

The judgment is affirmed.

George, C. J., Kennard, J., Werdegar, J., Chin, J., Moreno, J. and Corrigan, J., concurred.

Appellant's petition for a rehearing was denied September 24, 2008. Corrigan, J., did not participate therein.