Filed 2/24/26  P. v. Saenz CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>NATHAN SAENZ,<br><br>    Defendant and Appellant. | A172268<br><br>(San Bernardino County<br> Super. Ct. No. FSB24001792) |

Nathan Saenz[1] appeals from a judgment after a jury trial convicting him of felony criminal threats, felony assault with a deadly weapon, and misdemeanor disobeying a court order.  Nathan contends that the trial court erred by failing to sua sponte provide a jury instruction on the lesser included offense of attempted criminal threats because substantial evidence showed the victim lacked the requisite "sustained fear" and he was prejudiced by this error.  We disagree and affirm.

## BACKGROUND

Nathan, Leopoldo, and Jaime Garcia reside on the same property in San Bernadino.  Garcia, who is Leopoldo's nephew and Nathan's cousin, lives in a trailer in the backyard.  Nathan, who is Leopoldo's son, is the subject of

---

[1] We refer to Nathan and his father, Leopoldo Saenz, by their first names to avoid confusion; we intend no disrespect.

1

two restraining orders[2] requiring him to stay at least 100 yards away from the property and have no contact with Leopoldo and Garcia. However, Nathan would "break[] the lock" or "break the windows" to get into the house "when he just didn't have anywhere to stay," so Leopoldo would let Nathan stay in a converted bedroom in the garage. This meant Nathan lived at the house "practically" every day, "[e]ven though there's a restraining order."

On May 15, 2024, Nathan and Leopoldo had an argument at the house. Around 9:00 or 10:00 a.m., Leopoldo called Garcia for help, but Garcia said he could not assist until he finished work and told Leopoldo to call the police. Leopoldo did not call the police and instead waited for Garcia to return because his "lack of hearing and speech" makes it "always a problem for him to understand what they're telling him."

When Garcia arrived home around 6:00 or 6:30 p.m., Leopoldo was sitting on the porch. Using "vulgar words," Leopoldo explained what had happened; he said he had "kicked out" Nathan, but Nathan refused to leave. Leopoldo directed Garcia to the garage bedroom "to tell [Nathan] that he was not supposed to be there." Garcia first went to his trailer to get something to drink, after which he returned to the house and entered the garage bedroom. Garcia found Nathan there with a friend, whom Garcia told to leave. After the friend left, Garcia sat down on a chair and asked Nathan, who was

---

[2] The first restraining order arose out of a September 2019 incident during which Nathan was alleged to have stabbed Leopoldo with an ice pick. A five-year restraining order issued on February 11, 2020, and prohibited Nathan from contacting Leopoldo and coming within 100 yards of the property. The second restraining order arose out of an unspecified incident that resulted in the April 25, 2023, issuance of another five-year restraining order that protected both Leopoldo and Garcia and repeated the direction to stay at least 100 yards away from the property. Both restraining orders were in effect during the May 2024 incident that led to the trial and conviction that is at issue in this appeal.

standing by the bed about four to five feet away, "what was going on." Nathan began to get upset. Garcia told Nathan that Leopoldo did not want him at the house and he was "not allowed to be here." In response, Nathan said he had "received a paper stating he owns the house and the house is his and that if anybody should leave it should be" Garcia and Leopoldo. At that point, Leopoldo popped his head into the room, and Nathan threatened to kill him. Leopoldo left; Garcia did not believe Leopoldo heard the threat.

Garcia told Nathan to relax and "waived my hand at him" to "like relax." Garcia said, "I need you to leave. You're causing too much problem, leave. Your dad doesn't want you here. I definitely don't want you here." When Nathan refused, Garcia stated, "you're aware we have a restraining order against you, you shouldn't be here." But Nathan repeated it was "his house, he can do whatever he wants"; he wanted Garcia and Leopoldo to leave.

The "situation escalated"; Nathan was getting agitated and louder and told Garcia to "get the fuck out of the room." Garcia responded, "we cannot continue this. This has gone too far." Nathan was "irate" and told Garcia to "get the fuck out of my room or else I'm going to kill you." Garcia was "upset too" and got "a little mad" and said, "this is not going to happen," but "that time [Nathan] got real mad, picked up a screwdriver and he waived it at me, told me he was going to kill me."

Garcia rose from the chair. He reflected, "I thought about my kids. . . . If I don't attack him, what if he gets the best of me" because he was fearful for his life. Nathan held the screwdriver—which had a metal portion that was four to five inches in length—in his right hand, extended it "fully out," and took a couple steps around the edge of the bed toward Garcia. Garcia

"shot out of the room." He walked to the backyard, tried to compose himself, and called 911 "about five minutes" later.

Responding officers were dispatched at 8:25 p.m. and arrived at the house at 8:30 p.m. They conducted a records check and verified the five-year criminal protective order issued on April 25, 2023, was still in effect. Officers also located a screwdriver that matched Garcia's description; the metal tip was approximately five inches long, and it had a black and yellow handle.[3] When speaking to the officers after the incident, Garcia represented he was still "fearful" because of Nathan's "aggressive demeanor."

Nathan was arrested and ultimately proceeded to jury trial on a criminal information alleging three counts: felony criminal threats likely to result in death or great bodily injury (Pen. Code,[4] § 422, subd. (a); count 1); felony assault with a deadly weapon with force likely to produce great bodily injury (§ 245, subd. (a)(1); count 2); and misdemeanor disobeying a court order (§ 166, subd. (a)(4); count 3). The information further alleged 18 circumstances in aggravation under the California Rules of Court, rule 4.421.

At trial, Garcia testified Nathan had said, "I'll kill you" "more than three times." Garcia had been "Scared. Fearful. . . . I really can't iterate how you feel at that time, you know what I mean, when your life is threatened. It's just something weird. That's a feeling, anxious, get the hell out of there, and I just bolted out of the room." Garcia and Nathan had been approximately three feet apart when Garcia fled. Garcia felt as though if he

---

[3] Garcia described the screwdriver as a Phillips head, but the photograph of the collected screwdriver that was admitted into evidence at trial was a flathead. Garcia testified that he did not "recollect" if the screwdriver in the photograph was the same screwdriver with which Nathan had threatened him.

[4] Further undesignated statutory references are to the Penal Code.

4

did not leave the room, Nathan would have acted on the threat. Garcia estimated the interaction with Nathan lasted "15 or 20 minutes," but he was "not sure the actual time frame of everything that happened exactly within that duration" including when he arrived home. Garcia said that they conversed "for a while," and he became fearful for his life about 10 minutes into the conversation.

Leopoldo testified that he did not remember the incident and denied that Nathan had harmed him before but also stated that Nathan breaks locks and windows to get into the house, and "I can't get him out. [¶] . . . [¶] He hits me." Although Leopoldo said he previously wanted Nathan out of the house, at trial he explained, "Right now I want him to live in that room. [¶] . . . [¶] He's my son. He's my son. If I were living in a cave I would want him with me."[5]

Pursuant to section 1101, subdivision (b), in order to show motive and intent, the People also introduced evidence of two prior incidents involving both Garcia and Leopoldo in 2019 and 2020. The first incident took place on September 19, 2019, and began with an argument between Leopoldo and Nathan about washing Leopoldo's coffee cup. Nathan got upset and at that point, "a physical altercation happened," and Nathan put Leopoldo "in a choke hold" and "stabbed him in the neck." Leopoldo went to Garcia's room to ask for help; he had blood on his neck. Leopoldo "was babbling about Nathan had attacked him" and brought Garcia to the kitchen, where Nathan was standing over the stove holding a spatula.

---

[5] Subsequently, the court granted the People's request to introduce Leopoldo's prior statements to law enforcement detailing the different incidents as "prior inconsistent statements." These rulings are not challenged on appeal, so we do not discuss them further.

Leopoldo entered the kitchen, swearing and trying to kick [Nathan] out of the house. [Nathan] turned around answering him, defending himself. There was a scuffle." Garcia tried to intervene and "got in the middle of both of them." Nathan had an ice pick in his hand. Garcia noticed Leopoldo "bleeding on his neck as I pulled him away." Nathan tried to attack Leopoldo again, and Garcia "pushed him real hard," but when Nathan "came back at it," he poked Leopoldo's arm with an ice pick. There was blood on Leopoldo's arm and neck. Nathan put Leopoldo "into a choke hold," and Leopoldo fell to the ground. Garcia helped Leopoldo back up, and Nathan "left to go back to his room. He was not concerned of anything." Garcia "rushed to [his] house" and called the police. Responding police officers saw Leopoldo "had a laceration to his neck area" and arrested Nathan but did not locate an ice pick. Garcia testified he later found the ice pick "[o]n the bottom of the kitchen table." As a result of this incident, the above-referenced February 2020 restraining order issued prohibited Nathan from contacting Leopoldo and directed him to stay 100 yards away from the property.

The second incident took place on August 1, 2020, when Garcia's cousin "ran to [his] room" and said Nathan was fighting with Leopoldo. Garcia ran through the back side door into the house to find Nathan "throwing . . . [s]ome pots and pans"; Leopoldo was "yelling at him to leave, get out of the house, leave." Nathan walked towards his garage bedroom, and Leopoldo was "chasing him," telling him, "no, you don't go there, you go outside, get out of here." Nathan grabbed something from the dresser; it was a 10-inch knife with a wooden handle that had gray duct tape on it. Nathan was waving it at Garcia and Leopoldo, indicating for them to get out of the room. Nathan told Leopoldo he had "better leave or else he was going to kill him . . . ." Nathan was "irate," "furious, mad, yelling, cursing at [them]."

6

Leopoldo left, but Garcia stayed and attempted to defuse the situation. "[A]t that moment" the knife slipped from Nathan's hand and landed on the bed; Garcia grabbed the knife and walked out. Nathan said, "he had a gun at his friend's house down the street and that he was going to come back right now with it," but Garcia "wasn't that fearful because I knew that he was going to leave and I was already calling the police." When the police arrived, Nathan was gone. A responding officer testified that the February 2020 restraining order was in effect at the time of the incident.

At the conclusion of evidence, Nathan moved to dismiss counts 1 and 2 (violations of §§ 422 & 245, subd. (a)(1), respectively), pursuant to section 1118, arguing Garcia was "in a position of power and authority . . . and was not sufficiently in fear of his life" and that "the waiving of a screwdriver" from that distance "doesn't rise to the level" of assault with a deadly weapon. In the alternative, Nathan requested counts 1 and 2 be reduced to misdemeanors pursuant to section 17, subdivision (b). After hearing counter-argument from the People, the court denied the motions, concluding, "there is substantial evidence that does prove beyond a reasonable doubt each of the elements of those offenses" and noting, "when we look at the history of conflicts leading to assaults, some of which involved weapons, probation, protective orders being violated, ongoing course of conduct, I don't think that it's appropriate to reduce[] the matter to a misdemeanor at this time."

The jury subsequently found Nathan guilty of all three counts. Following a court trial, the court found four factors in aggravation to be true and also found several factors in mitigation. The court stated the aggravating and mitigating factors "balance each other out," denied probation, and sentenced Nathan to the three-year middle term on count 2, assault with a deadly weapon, and a concurrent two-year middle term on

count 1, felony criminal threats, for a total term of three years in state prison, with custody credits of 268 days (134 days actual plus 134 days conduct). The court denied probation on count 3, misdemeanor violation of a court order, and gave Nathan credit for the custody time he had already served as a "terminal disposition."[6] The court issued a new five-year restraining order protecting Garcia and Leopoldo and directing a 100-yard stay away from the property.

Nathan timely appeals.

## DISCUSSION

Nathan contends that (1) the trial court erred in failing to sua sponte instruct the jury on attempted criminal threats as a lesser included offense of criminal threats, and (2) he was prejudiced by this error because the "jury might have convicted [him] of attempted criminal threats without a finding of reasonable fear, even absent actual fear," requiring reversal. We disagree because the evidence did not support such an instruction, and even if it did, any error was harmless.

### I. No Sua Sponte Instruction Required

"On appeal, we review independently the question whether the trial court improperly failed to instruct on a lesser included offense." (*People v. Souza* (2012) 54 Cal.4th 90, 113.) "A trial court has a sua sponte duty to 'instruct on a lesser offense necessarily included in the charged offense if there is substantial evidence the defendant is guilty only of the lesser.' " (*People v. Shockley* (2013) 58 Cal.4th 400, 403.) "[T]he 'substantial' evidence required to trigger the duty to instruct on such lesser offenses is not merely

---

[6] The court also terminated Nathan's misdemeanor probation for "disobeying a court order" in a different docket as "unsuccessful," giving Nathan credit for the time he had already served.

8

'*any* evidence . . . no matter how weak' [citation], but rather ' "evidence from which a jury composed of reasonable [persons] could . . . conclude[ ]" ' that the lesser offense, but not the greater, was committed." (*People v. Cruz* (2008) 44 Cal.4th 636, 664; see *People v. Breverman* (1998) 19 Cal.4th 142, 162, overruled on other grounds by *People v. Schuller* (2023) 15 Cal.5th 237, 260, fn. 7 [trial court errs if it fails to sua sponte instruct on a lesser included offense which finds substantial support in the evidence].)

"In order to prove a violation of section 422 [criminal threats], the prosecution must establish all of the following:  (1) that the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat—which may be 'made verbally, in writing, or by means of an electronic communication device'—was 'on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4) that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances." (*People v. Toledo* (2001) 26 Cal.4th 221, 227–228 (*Toledo*).)

An attempted criminal threat is a lesser included offense of a criminal threat.  (*Toledo*, *supra*, 26 Cal.4th at pp. 231–232.)  " '[I]f a defendant . . . acting with the requisite intent, makes a sufficient threat that is received and understood by the threatened person, but, for whatever reason, the threat does not *actually* cause the threatened person to be in

9

sustained fear for his or her safety even though, under the circumstances, that person reasonably could have been placed in such fear, the defendant properly may be found to have committed the offense of attempted criminal threat.' " (*People v. Chandler* (2014) 60 Cal.4th 508, 515.) " '[S]ustained' . . . means a period of time that extends beyond what is momentary, fleeting, or transitory." (*People v. Allen* (1995) 33 Cal.App.4th 1149, 1156 (*Allen*).)

Nathan "does not argue here that there was insufficient evidence to support the jury's verdict" on the criminal threats charge alleged in count 1. Instead, he contends that even if there was substantial evidence to support the criminal threats verdict, "there was also substantial evidence to support the lesser-included offense of attempted criminal threats" because the jury "could have concluded that [Garcia] did not experience sustained fear, despite his challenged testimony to the contrary, given the prior history between" the parties. Nathan asserts that at trial he argued that Garcia "did not act like he was in fear" and, had the court provided the instruction, "then at least one member of the jury may have had a reasonable doubt" about Garcia's sustained fear because it was an "equally plausible" lesser included offense. Nathan further contends that the court had a sua sponte duty to instruct on the lesser included attempt "even if any failure to request [it] by the defense was arguably part of trial tactics." Nathan argues the jury had "ample grounds to find that he was not actually in sustained fear" because Garcia had not been fearful in the prior incidents, "did not leave immediately" after seeing Nathan with the screwdriver, and instead, "calmly left the garage." In fact, if Garcia returned from work around 6:00 or 6:30 p.m. but did not call the police until approximately 8:25 p.m., Nathan contends that means about two hours elapsed between the argument and when Garcia called the police,

10

which is a further sign of insufficient fear. Nathan also points to the court's "mus[ing]" that it might have reduced the charges to misdemeanors if not for Nathan's past incidents to support his argument that substantial evidence supported a conviction for only a lesser offense. We are not persuaded.

Here, there was ample evidence that Nathan could not be found guilty of only attempted criminal threats—and therefore no sua sponte jury instruction for attempt was warranted—because Garcia testified explicitly and convincingly that during the May 2024 incident, unlike during the prior disputes, he was fearful for "a sustained period," which, as Nathan acknowledges, does not require a specific duration of time. (*People v. Shockley*, *supra*, 58 Cal.4th at p. 403; *Toledo*, *supra*, 26 Cal.4th at pp. 227–228.)

Garcia described Nathan's increasing anger during the May 2024 incident and how the "situation escalated." He testified that when Nathan began "[a]ctually coming at [him]," he was "Scared. Fearful. . . . I really can't iterate how you feel at that time, you know what I mean, when your life is threatened. It's just something weird. That's a feeling, anxious, get the hell out of there, and I just bolted out of the room." Garcia felt as though Nathan would have acted on the threat if he did not leave the room; he was afraid because of the "way [Nathan] came at me, the way he looked at me, his anger." Garcia explained, "the guy you see right now is cute and handsome, [but] at that moment it was something I never saw in him." Garcia "saw so much anger in [Nathan's] face. I saw something that was different that I never seen. And like I said, you -- you have to experience something like that, go through it, see it, in order to know what fear really is, and my -- I felt my life was gone for a moment when I saw him coming at me." Garcia represented that he "never had that type of fear in my life. . . . [¶] He's done

11

it numerous times, but this time it was more intense, more serious. . . .  I was angry, mad, nervous.  I wanted to go back in there, but . . . I want to see [my children and grandchildren] grow up."  "Even when the police got there[,] I was still nervous" because of Garcia's "aggressive demeanor" that was "intense."

In addition, Garia's testimony detailing the difference between his sustained fear in May 2024 and his feelings in September 2019 and August 2020 is supported by the factual differences between the charged incident and the prior incidents.  Most notably, Leopoldo was the target of Nathan's anger in the prior incidents, whereas here, Garcia was.  Garcia testified there had been "so many incidents" between Nathan and Leopoldo, including "scuffles before."  Although Nathan and Garcia had had physical altercations themselves where "sometimes [Garcia] won and sometimes [Nathan] won," in the September 2019 incident, Leopoldo had come to Garcia for help, and in the August 2020 incident, another cousin sought Garcia for assistance after Nathan began to fight with Leopoldo.  In both prior incidents, Garcia had acted as a pacifier, intervening and trying to "[de]fuse" the tension.  But the May 2024 incident was different; as Garcia testified, Nathan "came at me," and Garcia "saw something that was different that I never seen."  (See, e.g., *Allen, supra,* 33 Cal.App.4th at p. 1156 [a "victim's knowledge of defendant's prior conduct is relevant in establishing that the victim was in a state of sustained fear"].)  Garcia was so shaken, he was "still nervous" after the police arrived.

Nor does the evidence support Nathan's claim that Garcia could not have been afraid because he waited two hours after the incident to call the police.  First, fear does not necessarily end after a threat has passed.  (See *People v. Culbert* (2013) 218 Cal.App.4th 184, 191 ["Experiencing relief that

one has survived is not the same thing . . . as having one's fear evaporate"]; *People v. Melhado* (1998) 60 Cal.App.4th 1529, 1537–1538 [calls to the police are evidence that a victim is in fear of the defendant].)  Second, the record does not support Nathan's claim of a two-hour delay.  Garcia testified he came back from work around 6:00 or 6:30 p.m.  Then, he spoke with Leopoldo about what had happened.  Then, Garcia went to his trailer where he consumed a can of Diet Coke.  Then, Garcia returned to the house and found Nathan with a friend.  Only after the friend left, did Garcia begin his conversation with Nathan that lasted "a while."  Garcia estimated the conversation lasted 15 to 20 minutes, but he also stated that he was "not sure the actual time frame of everything that happened exactly within that duration," including when he arrived home.  Regardless, part way through that conversation, Nathan became "irate," grabbed a screwdriver, waived it at Garcia, and threatened to kill him.  As Nathan made clear, he "does not argue here that there was insufficient evidence to support the jury's verdict."  It was after these threats that Garcia "shot out of the room" and called the police.  Though specific time estimates may be off, there was no mention of delay.  In fact, Garcia testified that he walked to the backyard, tried to compose himself, and then he called the police "about five minutes later."

In sum, it is Nathan's own and different conduct that supports Garcia's testimony detailing his different and sustained level of fear in the May 2024 incident.  (*People v. Cruz, supra*, 44 Cal.4th at p. 664; *Allen, supra*, 33 Cal.App.4th at p. 1156.)  As such, the evidence of Garcia's sustained fear means that Nathan could not be found guilty of attempted criminal threats, relieving the court of any potential sua sponte instruction obligation.  (*Cruz*, at p. 664 [The court must instruct "on lesser included offenses when the evidence raises a question as to whether all the elements of the charged

13

offense were present, but not when there is no evidence that the offense committed was less than that charged"].)

## II. Any Error Was Harmless

Contrary to Nathan's claim of prejudice, even if the absence of an attempted threat jury instruction was error, it is harmless.

"Any error in failing to instruct on a lesser included offense is subject to the harmless error test set forth in *People v. Watson* (1956) 46 Cal.2d 818" (*Watson*), whereby "reversal is only required if it appears 'reasonably probable' the defendant would have obtained a more favorable outcome had the jury been properly instructed." (*People v. Perez-Robles* (2023) 95 Cal.App.5th 222, 235 (*Perez-Robles*).) "[T]he *Watson* test for harmless error 'focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' "[7] (*People v. Beltran, supra*, 56 Cal.4th at p. 956.)

---

[7] Nathan states, it "remains unresolved whether the erroneous failure to instruct on a lesser-included offense amounts to a denial of federal constitutional rights to be evaluated for prejudice on appeal under the more stringent test set forth in *Chapman v. California* (1967) 386 U.S. 18, 24" instead of *Watson*. However, his cited cases are inapposite as they concern the narrow area of heat-of-passion instructions to be given in homicide cases. (See, e.g., *People v. Franklin* (2018) 21 Cal.App.5th 881, 890–891 ["whether the absence of instruction on heat of passion amounts to federal constitutional error" governed by *Chapman* or constitutes an error of state law only subject to *Watson* review remains unsettled]; see also *People v. Wang* (2020) 46 Cal.App.5th 1055, 1071.) Our Supreme Court has made clear

Nathan cites *People v. Racy* (2007) 148 Cal.App.4th 1327, 1335, and *Perez-Robles*, *supra*, 95 Cal.App.5th at pages 236–239 for the general principle that reversal of the conviction for the greater offense is required " 'if, "after an examination of the entire cause, including the evidence" [citation], it appears "reasonably probable" the defendant would have obtained a more favorable outcome had the error not occurred.' " (*Racy*, at p. 1335.) "[I]n assessing prejudice, it does not matter that the jury chose to convict the defendant of the greater offense over acquittal or that the defendant was convicted of the greater offense on sufficient evidence." (*Ibid.*) " 'When a greater offense must be reversed, but a lesser included offense could be affirmed,' the People have the 'option of retrying the greater offense, or accepting a reduction to the lesser offense.' " (*Id.* at p. 1336.)

But Nathan's citations do not further his claims. We do not dispute the applicable legal standards or that a prosecutor may retry the reversal of a greater offense or accept the reduction to a lesser offense. But we do disagree that the cited cases, which involve "wobblers"[8] where the trial court neglected to provide misdemeanor instructions for the felony offenses charged bears any true analogy to the instant case, which involves a lack of evidentiary support for the lesser instruction now requested. (Cf., *People v. Racy*, *supra*, 148 Cal.App.4th at pp. 1334–1335 ["the evidence supporting the guilty

---

that *Watson* applies when a trial court has not sua sponte given instructions for lesser-included offenses. (*People v. Beltran* (2013) 56 Cal.4th 935, 955 [" 'in a noncapital case, error in failing sua sponte to instruct, or to instruct fully, on all lesser included offenses and theories thereof which are supported by the evidence must be reviewed for prejudice exclusively under . . . [*Watson*]' "].) We therefore apply *Watson* here.

[8] " ' "Wobbler[s]" ' " are crimes that " 'are chargeable or, in the discretion of the court, punishable as either a felony *or* a misdemeanor.' " (*People v. Superior Court* (*Mitchell*) (2024) 17 Cal.5th 228, 242.)

verdict of felony elder abuse was not so compelling that the jury instead could have reasonably reached a guilty verdict of misdemeanor elder abuse"]; *Perez-Robles*, *supra*, 95 Cal.App.5th at p. 239 [the court agreed that " 'Misdemeanor [sexual] battery was a readily available alternative [to felony sexual battery] which would have been adopted by this jury' had it been properly instructed . . ."].)

Even Nathan recognizes the strength of the evidence that does not make it "reasonably probable" an additional jury instruction would have resulted in a different outcome, as he wisely "does not argue here that there was insufficient evidence to support the jury's verdict" on the charge of criminal threats. Where "the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, . . . there is no reasonable probability the error of which defendant complains affected the result." (*People v. Breverman*, *supra*, 19 Cal.4th at p. 177.)

In sum, because Nathan does not demonstrate that " 'it is reasonably probable a more favorable result would have been obtained absent the error' " had the jury been instructed on the lesser included offense of an attempted criminal threat, any error was harmless.[9] (*People v. Beltran, supra*, 56 Cal.4th at p. 955.)

---

[9] We also note that the court ordered the two-year sentence imposed on count 1 to run concurrent with the three-year sentence on count 2, meaning a reversal of the criminal threats (count 1) conviction would not change the amount of time to be served in custody. However, we consider Nathan's claim of prejudice because we recognize that a conviction can have collateral consequences that extend beyond the time ordered to be served. (See *People v. DeLong* (2002) 101 Cal.App.4th 482, 492 [appeal from criminal conviction is not moot because "to the extent the conviction continues to exist" defendant "continues to suffer disadvantageous and prejudicial collateral consequences"]; see also *People v. Moore* (1998) 69 Cal.App.4th 626, 630

## DISPOSITION

The judgment is affirmed.

---

[potential "collateral" consequences may include "the possibility of enhanced punishment in the event of a future conviction," "the possibility of probation revocation in another case," and "limitations on the ability to earn conduct and work credits while in prison"].)

DESAUTELS, J.

We concur:

STEWART, P. J.

RICHMAN, J.

*People v. Saenz* (A172268)